DAVID E. GRALNEK AND BARBARA C. GRALNEK, ET AL. [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Gralnek v. Commissioner
Docket Nos. 14467-85, 37361-85, 16974-86
United States Tax Court
T.C. Memo 1989-433; 1989 Tax Ct. Memo LEXIS 431; 57 T.C.M. (CCH) 1313; T.C.M. (RIA) 89433; August 16, 1989; As corrected August 17, 1989 Stephen *434 E. Silver and Brad S. Ostroff, for the petitioners. David W. Otto, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Taxable
Petitioner(s)
Docket No.
Year Ended
Deficiency
David E. and
14467-85
December 31, 1981
$  5,627
Barbara C.
Gralnek
James L. and
37361-85
December 31, 1979
$  5,404
Janet M.
December 31, 1980
$ 13,198
Schamadan
December 31, 1981
$ 20,484
Ray Z. and
16974-86
December 31, 1982
$ 17,834
Linda K.
Franks
Additions to Tax
Sec. [2]
Sec.
Sec.
Petitioner(s)
6653(a)(1)
6653(a)(2)
6661
David E. and
Barbara C.
Gralnek
James L. and
Janet M.
Schamadan
Ray Z. and
$ 891.70 *
$ 1,783.40
Linda K.
Franks
In the notices of *435 deficiency sent to petitioners in docket Nos. 37361-85 and 16974-86, respondent also determined that section 6621(c) (formerly section 6621(d)) [3] dealing with interest on substantial underpayments attributable to tax motivated transactions was applicable. In docket No. 14467-85, respondent asserted the applicability of section 6621(c) in his answer to that docket number's filed petition. In an amendment to his answer filed in docket No. 14467-85, respondent asserted the applicability of sections 6659 and 6653(a). In an amendment to his answer filed in docket No. 37361-85, respondent asserted the applicability of sections 6659 and 6653(a)(1) and (2). Finally, in an amendment to his answer filed in docket No. 16974-86, respondent asserted the applicability of section 6659 and reasserted the applicability of section 6653(a)(1) and (2). After concessions [4] the issues for decision are: (1) whether petitioners are entitled to deductions with respect to sales and leasebacks of computer equipment, (2) whether petitioners are liable for *436 additions to tax under section 6653(a) and (3) whether in docket Nos. 14467-85 and 16974-86 the increased rate of interest under section 6621(c) applies. [5]
*437 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation, supplemental stipulations, and attached exhibits are incorporated herein by this reference. Petitioners David E. and Barbara C. Gralnek are husband and wife. David Gralnek ("Gralnek") is a practicing medical physician. The Gralneks resided at Phoenix, Arizona at the time their petition in this case was filed. In 1980, David Gralnek became a limited partner in Apache Investors, an Arizona limited partnership. Petitioners James L. Schamadan and Janet M. Schamadan are husband and wife. James Schamadan ("Schamadan") is a medical physician practicing as a hospital administrator in Scottsdale, Arizona. James and Janet Schamadan resided in Phoenix, Arizona at the time their petition in this case was filed. James Schamadan became a limited partner in Kachina '81 Investors in 1981. Petitioners Ray Z. Franks and Linda K. Franks are husband and wife. Ray Franks ("Franks") is a business executive and, in 1981, was employed as the Vice President of Corporate Information Systems for Quality Inns. From 1978 through 1980, he was the Director of Data Processing for Best Western Hotels. Ray *438 and Linda Franks resided at Phoenix, Arizona at the time their petition in this case was filed. In 1981, Ray Franks became a limited partner in Kachina '81 Investors. Apache Investors ("Apache") and Kachina '81 Investors ("Kachina '81") are each limited partnerships formed in Arizona by Systems Marketing, Inc. ("SMI"), a company involved in the purchase, sale, and leasing of new and used computer equipment. SMI served as a general partner of both Apache and Kachina '81. Robert Russell, ("Russell"), executive officer of SMI, was also a general partner of Kachina '81. Russell had been employed by IBM in a sales capacity from 1957 to 1966. After leaving IBM, Russell remained in the computer equipment field, working for Management Assistance, Inc. and Greyhound Computer Corporation. At both of these computer companies, Russell dealt with the purchase and lease to end users of IBM computer equipment. In 1968, Russell helped found Boothe Computer Corporation, a large computer brokerage firm in San Francisco, and remained with this company for three years. Russell left Boothe Computer Corporation in 1972 to found SMI in Phoenix, Arizona. From 1979 through 1982, Russell was the president *439 of SMI. SMI was headquartered in Phoenix, Arizona and operated on a fiscal period ended September 30th. The corporation primarily handled IBM equipment and included among its lessee clients some of the largest corporations in the United States. SMI was not a bank holding company nor the subsidiary of such a company during the years in dispute. For its fiscal periods ended in 1980 through 1983, SMI and its wholly-owned subsidiaries had the following consolidated balance sheet and income statement amounts: Year
1980
1981
1982
1983
Balance Sheets
Total Assets
$ 29,422,933
$ 44,226,832
$ 34,016,937
$ 62,032,033
Total Liabilities
27,084,633
41,404,912
30,019,698
57,123,957
Stockholder's Equity
2,338,300
2,821,920
3,997,239
4,908,076
Income Statement
Net Income
$    310,165
[6] $    483,620
$  1,074,986
$    936,414
*440 SMI's liabilities included both recourse and nonrecourse loans. Among the brokers or independent contractors associated with SMI and permitted to write contracts on a commission basis for the company was Paul Baillie ("Baillie"). Baillie had been employed by IBM in a sales capacity for 28 years. In 1974, while still employed by IBM, Baillie moved to Phoenix, Arizona. Baillie retired from IBM in 1975 and became an independent computer broker with SMI, receiving a commission of 30 percent of the profit of any transaction he brokered. While actively dealing for SMI, Baillie brokered for the company exclusively and represented himself as a member of SMI's marketing staff. SMI, moreover, provided Baillie with office space and the use of its stationery and equipment. As a result of a 1978 misunderstanding over commissions, Baillie all but fully severed his working relationship with SMI; he continued sporadically to broker for SMI through December of 1981. On April 13, 1979, Baillie and his wife incorporated Baillie Associates, Inc. ("BAI") as an Arizona corporation with a stated purpose of buying, selling and leasing computer equipment. Baillie had no particular idea in mind *441 for use of the corporation. The corporation had no assets in 1979, and was essentially dormant. No one has ever been employed by BAI. Stiteler Investments, Inc. ("SII") was formed in 1978 by John Stiteler ("Stiteler") and operated as a registered broker dealer in Phoenix, Arizona. SII was registered with the National Association of Securities Dealers and the Securities and Exchange Commission. Prior to forming SII, Stiteler had been employed on a fulltime basis by Connecticut General ("CG"). He ultimately became CG's general manager for the State of Arizona. In 1969 or 1970, CG began operating as a broker dealer. Initially, CG sold a variety of mutual funds, later expanding its business in 1971 or 1972 to market public offerings in real estate, oil and gas, and cattle feeding programs. By 1977, CG had expanded its marketing efforts to private offerings in real estate, equipment leasing, and oil and gas. In connection with these offerings, CG required that its agents be registered and pass a variety of tests. As the general manager for Arizona, Stiteler was the compliance officer and broker. Stiteler's first contact with equipment leasing transactions occurred sometime *442 in 1973 or 1974 when he was approached by a prospective client, a local attorney. At that time, CG did not offer such investments. However, Stiteler knew of an investment banker and attorney in New York City, Kent Klineman ("Klineman"), who specialized in equipment leasing transactions. Stiteler and his client met with Klineman. As a result of Stiteler's involvement with Klineman, CG began, in 1978, to market equipment leasing transactions, using Klineman as a principal sponsor. In 1978, Stiteler resigned from his managerial position with CG to open SII. However, Stiteler stayed on with CG as a broker until he retired in 1985. In resigning from his managerial position at CG and starting SII, Stiteler, through SII, continued to market Klineman equipment leasing transactions. Stiteler and Russell had known each other since the early 1970's and were neighbors. After preliminary discussions, the two decided to collaborate on the structuring and marketing of equipment leasing transactions. These leasing transactions were similar to those of Klineman. In 1979, Russell, on behalf of SMI, and Stiteler, on behalf of SII, established an equipment leasing package entitled Kachina *443 Investors, also known as Kachina '79 ("Kachina '79"). In establishing Kachina '79, SMI retained the law firm of Wentworth & Lundin to represent its interests. The Wentworth & Lundin partner-in-charge was Richard Feldheim ("Feldheim"), an attorney who had previously worked in the equipment leasing area while at Price Waterhouse and Goldman Sachs. SII retained the law firm of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears. At Feldheim's suggestion, SMI engaged Price Waterhouse to render tax advice, to examine financial forecasts, and to add some credibility to the transaction. James Gallagher ("Gallagher") was the Price Waterhouse tax partner who dealt with SMI's equipment leasing transactions. Wentworth & Lundin prepared the private offering memorandum for Kachina '79. After it was issued, Stiteler sent a copy of the Kachina '79 offering memorandum to Klineman for his review. BAI, which was not otherwise a party to this arrangement, prepared a fair market appraisal of the computer equipment involved in Kachina '79. Apache Investors ("Apache"), a second limited partnership, was formed December 28, 1979, to engage in the business of acquiring and leasing computer *444 equipment. Initially, Russell and SMI served as the general partners of Apache, and Apache's then sole limited partner was another executive of SMI, Leonard E. Lavoie. In an amendment to Apache's Agreement and Certificate of Limited Partnership, executed May 30, 1980, Russell withdrew as a general partner of Apache. The partnership agreement was amended and restated twice more in June of 1980 to admit additional limited partners, to acquire additional computer equipment, and to provide for additional capital contributions. Apache engaged in one small transaction in January of 1980. The partnership acquired a $ 9,000 piece of computer equipment then on lease to Advanced Computer Techniques Corporation. The transaction involved SMI's sale to Apache of the equipment, subject to an existing bank lien and the lease to the end user. On May 31, 1980, BAI agreed to pay SMI $ 3,268,000 for computer equipment consisting of central processing units and peripherals already on lease to the Arizona Bank, El Paso Electric Company, Coca Cola Company, Phoenix Baptist Hospital, Summa Corporation and Tucson Electric Power Company. The end user lease terms varied from 59 months to 84 months in *445 duration. SMI presented BAI with a bill of sale for the purchased equipment. BAI executed an agreement granting SMI a security interest in this equipment. BAI assumed none of SMI's existing debt when it purchased the equipment. The purchase price of $ 3,268,000 was payable as follows: (a) $ 48,000 in cash on or before July 1, 1980; (b) execution of a negotiable, nonrecourse purchase money promissory note in the principal sum of $ 3,220,000 plus accrued interest at the rate of 13.5% per annum through December 31, 1982, and thereafter at the rate of 13.995% per annum, with payments as follows: (i) an interest only payment of $ 253,575 on December 31, 1980; (ii) combined principal and interest payments of $ 274,850 each on June 30 and December 31, 1981; (iii) a combined principal and interest payment of $ 262,088 on June 30, 1982; (iv) a combined principal and interest payment of $ 262,087 on December 31, 1982; and (v) equal semiannual payments of principal and interest beginning on June 30, 1983, and ending on June 30, 1989, in an amount necessary to amortize the remaining balance of $ 3,000,000. Prior to selling this computer equipment to BAI, SMI had purchased the *446 equipment by borrowing a portion of the equipment's original purchase price from various banks. In initially purchasing some equipment, SMI used nonrecourse financing. As obligor, SMI signed promissory notes, executed security agreements on the equipment, and assigned rents to the various banks. The expiration date of the end user leases on the equipment was comparable to the duration of the bank financing. As required by the rental assignments, the rents due from the end user lessees to SMI, which matched the principal and interest payments SMI owed to the banks, were remitted by the end user lessees directly to the banks. In June of 1980, Apache purchased from BAI for $ 3,268,000 the same computer equipment sold by SMI. The computer equipment purchased by Apache was subject to the previously noted leases between SMI, as lessor, and the end users and subject to existing liens. [7] BAI presented Apache with a bill of sale for the purchased equipment. Apache executed a security agreement granting BAI a security interest in the equipment. Apache assumed none of BAI's existing debt when it purchased the equipment. The $ 3,268,000 purchase price was payable as follows: (a) a *447 cash payment of $ 66,430 plus accrued interest of $ 3,570 on July 1, 1980; (b) execution of a negotiable purchase money promissory note in the principal amount of $ 201,570 plus interest at the rate of 16 percent per annum, payable in installments of $ 109,660 plus accrued interest of $ 20,160 on February 15, 1981, and $ 91,910 plus accrued interest of $ 14,710 on February 15, 1982; (c) execution of a second negotiable purchase money promissory note in the principal amount of $ 3,000,000 plus interest at the rate of 14 percent per annum, payable as follows: (i) an interest only payment of $ 245,000 on December 31, 1980; (ii) semiannual interest only payments of $ 210,000 each on June 30 and December 31 of 1981 and 1982; and (iii) semiannual payments of principal and interest in the amount of $ 358,953 each on June 30 and December 31 of each year beginning June 30, 1983, and ending June 30, 1989. Language in this second negotiable purchase money promissory note provided as follows: This note may be secured by a Security Agreement of even date herewith entered into between the Partnership as debtor and Payee as secured party. Anything herein to the contrary notwithstanding, *448 in the event of any default under this Note, Payee (or any assignee or holder of this Note) shall have as its sole recourse those remedies that may be available under said Security Agreement and shall have no recourse against the Partnership. In the event the rents from the end users were not sufficient to service the underlying, secured bank indebtedness, Apache was permitted to make payments to the banks to cover any such deficiencies. Any payments by Apache to the banks were to be credited against amounts owed by Apache to BAI under the $ 3,000,000 long-term note. In June of 1980, Apache leased the purchased computer equipment to SMI for a term of 104 months. The lease between Apache and SMI was a triple net lease. The lease provided that the computer equipment was the property of Apache, could be removed after the termination of the lease, and allowed Apache to affix tags, decals, or plates to the equipment indicating *449 its ownership. Apache expressly subordinated its rights in the computer equipment and end user leases to the banks financing SMI's initial purchase of the equipment and to the security interests filed by the banks on the equipment. In a separate lease provision, Apache, as lessor, acknowledged and consented to the subleases between SMI and the end users. Because some end users had the right to purchase the equipment, this lease between Apache and SMI obligated SMI to pay the proceeds of any sales to Apache to the extent of any remaining unpaid rent or to replace the equipment with equipment of like kind and value. Pursuant to the lease agreement, SMI, as lessee, agreed to pay Apache, as lessor, basic or minimum lease rentals of $ 51,600 on July 31, 1980, $ 154,800 on January 31 and July 31, 1981 and 1982, $ 380,953 on January 31 and July 31, 1983 through 1988, and $ 380,953 on January 31, 1989. To secure its lease obligations, SMI executed an agreement on the equipment granting Apache a security interest in all SMI's right, title, and interest in the equipment, end user leases, after-acquired property, and proceeds of conversion. Moreover, the lease gave Apache various options *450 in the event of SMI's default. The options included Apache's terminating the lease and taking possession of the equipment, subject to the rights of the end users and secured parties. A default occurred on SMI's failure to make a timely lease payment or SMI's filing of a petition in bankruptcy. The Apache partnership agreement also provided for automatic termination and dissolution of the partnership upon bankruptcy by its general partner, SMI. The lease between Apache and SMI gave SMI the right to sublease the equipment after the expiration of the initial end user leases as long as such subleases (1) were consistent with the terms of the lease between Apache and SMI; (2) did not exceed the term of this same lease; (3) specifically identified Apache as the owner of the computer equipment, and (4) were copied and provided to Apache. SMI also agreed to pay Apache 35 percent of the gross proceeds of rentals from its re-leasing of the equipment after the equipment came off the initial end user leases and SMI's bank loans on the equipment had been fully paid. In 1984, after the Internal Revenue Service ("Service") had begun its active investigation of the Apache transaction, SMI and *451 SII learned that Apache's computer equipment was not performing as forecasted. It was then decided that the percentage of additional rent to the partnership on the re-leasing of the equipment would be increased from 35 percent to 50 percent. In letters sent in late June of 1980, Feldheim notified end users of the equipment purchased by Apache of the sale of the leased equipment to Apache. A typical letter noted that "the IBM computer equipment * * * will be sold to Apache Investors, an Arizona limited partnership." The letter did not mention the previous sale of the equipment to BAI. Thirty-five units of Apache were sold to limited partners. Of these 35 units, SII as broker sold 32. For each unit purchased, the limited partner was required to make an initial $ 20,000 capital contribution payable over three years and to execute the long-term promissory note from Apache to BAI, agreeing to be liable for a portion of the total $ 3,000,000 liability. Gralnek became aware of the opportunity to purchase interests in computer leasing programs through a series of seminars offered by Stiteler at a local Phoenix country club. Gralnek attended, heard the presentation, and, after discussing *452 the matter with his accountant, decided to purchase an interest in Apache. His decision was basically predicated on his reading of the Apache private offering memorandum and the advice of his accountant. Gralnek did not take any specific steps to investigate BAI. In becoming a limited partner of Apache, Gralnek made an initial cash payment of $ 8,500 and executed, as payor, a promissory note to the partnership for $ 11,500 plus interest at 14 percent. The sum of the initial payment and promissory note amounts represented the $ 20,000 capital contribution Gralnek was to make to Apache. The promissory note required a payment of $ 6,000 plus interest on February 1, 1981, and $ 5,500 plus interest on February 1, 1982. The $ 11,500 note stated, This note may be secured by a security interest in Payor's rights, title and interest in and pursuant to the Partnership. Anything herein to the contrary notwithstanding, in the event of any default under this Note, Payee (or any assignee or holder of this Note) shall have as its sole recourse those remedies that may be available under said Security Agreement and shall have no recourse against Payor. Gralnek made all payments in accordance *453 with this $ 11,500 note. The long-term promissory note to BAI in the amount of $ 3,000,000 was executed by each of the Apache limited partners in counterparts as co-maker. Each of the counterpart notes was executed by Russell as president of SMI, the general partner. Language in the note specified that "Anything herein to the contrary notwithstanding, the total liability of the Limited Partner hereunder shall not exceed that sum set out below adjacent to such Limited Partner's signature." Gralnek's liability was limited to $ 85,714. The $ 3,000,000 long-term note nowhere mentioned the possibility of the noteholder's having recourse against the individual partners, personally, in the event of a payment default on the note. The amended Apache partnership agreement provided that "Each Limited Partner shall be further personally liable to make additional contributions * * * to the capital of the Partnership up to approximately 4-1/2 times the amount of such Limited Partner's Primary Contribution [in the minimum amount of $ 20,000.] * * *" The private offering memorandum for Apache contained a 26-page tax opinion from Wentworth & Lundin. The tax opinion used materials appearing *454 in documents prepared for equipment leasing transactions prepared by Klineman. Furthermore, an opinion letter prepared by Wentworth & Lundin which accompanied the offering memorandum noted that "The net worth of the General Partner is substantial, exclusive of any interest in this Partnership or in similar Partnerships." The Apache offering memorandum also included a letter from Price Waterhouse which stated that it had reviewed financial forecasts prepared by the partnership's management. Such forecasts, however, were "based on assumptions about circumstances and events that [had] not yet taken place and [were] subject to variations." Thus, Price Waterhouse gave "no assurance that the forecasted results [would] be obtained." In its 14-page letter, the accounting firm concluded that a $ 20,000 capital contribution would result in a cash return of $ 26,280 to the limited partner. This conclusion was premised on a zero value being given to the equipment at the expiration of the SMI lease. Price Waterhouse opined that in 1984 Apache would reach a "turn around point" where the partnership would earn net income. Finally, Gallagher concluded that, under the forecast, an Apache *455 limited partner would actually pay more taxes over the course of the transaction than the partner would save. At pages 23 and 24 of the offering memorandum a discussion of events of default appears. This discussion notes the various consequences to the Apache partners and their partnership in the event of a default in obligations by SMI, by the end users, or by BAI. In the event of a default by SMI under the lease agreement between Apache and SMI, Apache had the following remedies: the Lease may be terminated by [Apache]. After such a termination, [Apache], as direct lessor of the Equipment or by virtue of its rights as collateral assignee of the User Leases under a security agreement and collateral assignment granted by SMI to [Apache], will be entitled, under the terms of the Lease, to the rents or other proceeds realized from the User Leases (subordinate to the prior rights of holders of the Senior Bank Indebtedness and the Baillie Note). In addition, [Apache's] security interest covers any proceeds to which SMI is entitled from the sale or lease or other disposition of the Equipment prior to the date of the Lease. In lieu of presenting expert testimony on the *456 issues of the fair market value of the unencumbered Apache computer equipment, the parties agreed that $ 3,268,000 represented the fair market value of this equipment on June 1, 1980. Moreover, the parties agreed that the projected residual value of the computer equipment at the end of the lease term to SMI was sufficient at the date Apache purchased the equipment to provide a reasonable profit to Apache and that Apache became the owner of the equipment on or about June 1, 1980. During 1980 and 1981, the Apache partnership transaction operated as planned and money passed among Apache, SMI, and BAI. In 1980, 1981, and 1982, BAI's source of payments on its obligations to SMI could be traced to the Apache limited partners' $ 20,000 capital contributions, which were to be paid over this same three-year period, and to Apache's receipt of rental payments under its lease with SMI. After the Apache limited partners fulfilled their three-year capital contribution obligations, Apache's source of funds to pay BAI emanated from Apache's receipt of rent under its lease with SMI. These funds BAI then used to pay SMI. In 1981, Stiteler, Feldheim and Russell prepared another limited partnership, *457 Kachina '81, involving leased computer equipment. Kachina '81 was formed under the laws of Arizona and grew out of Kachina '79. Pursuant to an Amended and Restated Agreement of Limited Partnership, dated December 1, 1981, the Kachina '79 limited partnership was amended and superseded to provide for additional limited partners, additional capital contributions, and the acquisition and lease of additional computer equipment. The partnership was also renamed Kachina '81 Investors. The original limited partners of Kachina '79 were termed Class A partners and retained all their rights, interests, and liabilities. New limited partners were admitted and termed Class B partners. The Class B limited partners were to acquire, through their limited partnership interests, additional computer equipment, which the partnership purchased from BAI. Although Kachina '81 involved different equipment on lease to separate end user lessees, the form of the transaction was essentially identical to that of the Apache transaction structured the previous year. Feldheim again prepared all the documentation, including the offering memorandum in connection with the sale of interests in the Kachina '81 shelter. *458 On November 1, 1981, pursuant to a purchase and sale agreement, BAI paid $ 4,972,034 for computer equipment consisting of central processing units and peripherals already on lease to Summa Corporation, Best Western International, Inc., Volkswagen of America, Inc., and Ford Motor Company. The end user lease terms varied from 48 months to 62 months in duration. As in the Apache transaction, SMI presented BAI with a bill of sale for the purchased equipment, and BAI executed an agreement granting SMI a security interest in this same equipment. BAI assumed no debt of SMI on its purchase of the equipment. The purchase price of $ 4,972,034 was payable as follows: (a) $ 1,000 in cash on November 1, 1981; (b) $ 11,038 in cash on December 31, 1981; and (c) execution of a negotiable, nonrecourse purchase money promissory note in the principal sum of $ 4,879,996 plus accrued interest at the rate of 17 percent per annum with payments as follows: (i) a payment of interest in the amount of $ 64,401 on December 31, 1981; (ii) a combined principal and interest payment of $ 1,008,038 on July 1, 1982; (iii) a combined principal and interest payment of $ 953,711 on July 1, 1983; and
*459 (iv) annual combined principal and interest payments of $ 1,078,923 on July 1 of each year beginning July 1, 1984, and ending July 1, 1990, to amortize the remaining balance of $ 4,626,750. Prior to selling this second grouping of computer equipment to BAI, SMI had financed a good portion of the equipment's original purchase price with various banks. Certain loans made by the financial institutions to SMI to fund these equipment purchases took the form of nonrecourse debt. As obligor, SMI signed promissory notes, executed security agreements on the equipment, and assigned rents to the lending institutions. The lease expiration dates on the end user leases on this equipment were comparable to the duration of the bank financing. As required by the rent assignments, the rents due from the end user lessees to SMI, which matched the principal and interest payments SMI owed to the banks, were paid by the end user lessees directly to the banks. In December of 1981, Kachina '81, through its Class B limited partners, purchased from BAI for $ 4,972,034 the same computer equipment sold by SMI. The computer equipment purchased by Kachina '81 was subject to the previously noted loans *460 between SMI, as lessor, and the end users and subject to existing liens. [8] BAI presented Kachina '81 with a bill of sale for the purchased equipment. Kachina '81 executed a security agreement granting BAI a security interest in the equipment. Kachina '81 assumed no debt of BAI on its purchase of the equipment. The purchase price of $ 4,972,034 was payable as follows: (a) $ 92,038 cash on December 31, 1981; (b) execution of a negotiable purchase money promissory note in the principal amount of $ 253,246, plus interest at the rate of 21 percent per annum, payable in installments of $ 149,200 plus accrued interest of $ 31,023 on July 1, 1982, and $ 104,046 plus accrued interest of $ 21,850 on July 1, 1983; (c) execution of a second negotiable purchase money promissory note in the principal sum of $ 4,626,750 plus interest at the rate of 18 percent per annum, for the years 1981 through 1983, and at the rate of 14 percent thereafter payable as follows: (i) an interest-only payment of $ 69,401 on December 31, 1981; (ii) interest only payments of $ 832,815 each on July 1, 1982, and July 1, 1983; and (iii) combined principal and interest payments of $ 1,078,923 on July 1 of *461 each year beginning July 1, 1984, and ending July 1, 1990. Language in this second negotiable purchase money promissory note provided as follows: This Note may be secured by a Security Agreement of even date herewith entered into between the Partnership as debtor and Payee as secured party. Anything herein to the contrary notwithstanding, in the event of any default under this Note, Payee (or any assignee or holder of this Note) shall have as its sole recourse those remedies that may be available under said Security Agreement and shall have no recourse against the Partnership. In the event the underlying, secured bank indebtedness was not timely paid, Kachina '81 was permitted to make payments to the banks to cover any deficiencies. Any payments by Kachina '81 to the banks was to be credited against amounts owed by Kachina '81 to BAI. In December of 1981, Kachina '81 leased this computer equipment to *462 SMI for a term of 109 months. The lease between Kachina '81 and SMI was a triple net lease. The lease provided that the computer equipment was the property of Kachina '81, could be removed after the termination of the lease, and allowed Kachina '81 to affix tags, decals, or plates to the equipment indicating its ownership. Kachina '81 expressly subordinated its rights in the computer equipment and end user leases to the banks financing SMI's initial purchase of the equipment and to the security interests filed by the banks on the equipment. In a separate lease provision, Kachina '81, as lessor, acknowledged and consented to the subleases between SMI and the end users. Because some end users had the right to purchase the equipment, the lease obligated SMI to pay the proceeds of any sales to Kachina '81 to the extent of any remaining unpaid rent or to replace the equipment with equipment of like kind and value. Pursuant to the lease agreement, SMI, as lessee, agreed to pay Kachina '81, as lessor, a basic or minimum lease rental of $ 614,900 on June 30, 1982, $ 567,600 on June 30, 1983, and $ 1,078,956 on June 30, 1984, through June 30, 1990. To secure its lease obligations, SMI *463 executed an agreement on the equipment granting Kachina '81 a security interest in all SMI's right, title, and interest in the equipment, end user leases, after-acquired property, and proceeds of conversion. Additionally, the lease gave Kachina '81 various options in the event of SMI's default. The options included terminating the lease and taking possession of the equipment, subject to the rights of the end users and secured parties. A default occurred on SMI's failure to make a timely lease payment or its filing of a petition in bankruptcy. The terms of the partnership agreement, as amended to include Kachina '81, also provided for the termination and dissolution of the partnership upon the bankruptcy of a general partner. The lease between Kachina '81 and SMI gave SMI the right to sublease the equipment after the expiration of the initial end user leases, as long as such subleases (1) were consistent with the terms of the lease between Kachina '81 and SMI, (2) did not exceed the term of this same lease, (3) specifically identified Kachina '81 as the owner of the equipment, and (4) were copied and provided to Kachina '81. SMI also agreed to pay Kachina '81 25 percent or 32-1/2 percent, *464 depending on the equipment, of the gross proceeds or rentals from its re-leasing of the equipment after the equipment came off the initial end user leases and SMI's bank loans on the equipment had been fully paid. In 1984, after the Service had begun its active investigation of the Kachina '81 transaction, SMI and SII learned that Kachina '81's computer equipment was not performing as originally forecasted. It was then decided that the percentage of additional rent to Kachina '81 on the re-leasing of the equipment would be increased from 25 or 32-1/2 percent to 50 percent. Two hundred Class B units of Kachina '81 were to be sold in multiples of four units. SII acted as the broker in the marketing of the Kachina '81 partnership units. For each four units purchased, the limited partner was required to make an initial $ 20,000 capital contribution payable over three years and to execute the long-term promissory note from Kachina '81 to BAI, agreeing to be liable for a portion of the total $ 4,626,750 liability. Based upon Stiteler's recommendation, Schamadan purchased an interest in Kachina '81. Schamadan had previously purchased an interest in Kachina '79. He premised his decision *465 to purchase an interest in Kachina '81 on his reading of the shelter's private offering memorandum, his discussion with Stiteler, and his experience with Kachina '79. Schamadan made no independent investigation of BAI. Schamadan was familiar with computers. His first involvement with computers was during his undergraduate education courses. Later, as chairman of the Department of Biomedical Engineering at Arizona State University ("ASU"), Schamadan constantly used computers. He enrolled in advanced computer courses at ASU and had a computer in his office. While employed by the Whittaker Corporation, he introduced computers into the Saudi Arabian hospital system. He additionally helped develop a computer information system for a large Arizona health maintenance organization. Schamadan believed that Price Waterhouse's decision to allocate a zero residual value to the equipment in Kachina '81 was an underestimation because he personally believed that he could probably arrange an overseas sale of the equipment. In becoming a limited partner of Kachina '81, Schamadan made an initial cash payment of $ 4,800 on December 10, 1981, and executed, as payor, a promissory note to the *466 partnership for $ 15,200 plus interest at 14 percent. The sum of the initial payment and promissory note amounts represented the total capital contribution Schamadan was to make to Kachina '81. The promissory note required a payment of $ 8,100 plus interest on June 30, 1982, and $ 7,100 plus interest on June 30, 1983. Franks decided to become a limited partner in Kachina '81 based upon his familiarity with the computer equipment and end users involved, the advice of his accountant, the tax opinion of Wentworth & Lundin appearing in the Kachina '81 offering memorandum, and documentation prepared by Price Waterhouse which also appeared in the offering memorandum. Through his employment with Best Western Hotels and Quality Inns, Franks had helped design and install and had worked with much of the same computer equipment purchased by Kachina '81. In connection with his decision to purchase a partnership interest in Kachina '81, Franks never spoke with Baillie nor did he specifically understand why BAI had a part in the transaction. In becoming a limited partner in Kachina '81, Franks made an initial cash payment of $ 9,600 on December 18, 1981, and executed, as payor, a promissory *467 note to the partnership for $ 30,400 plus interest at 14 percent. The sum of the initial payment and promissory note amounts represented the total capital contributions Franks was to make to Kachina '81. The promissory note required a payment of $ 16,200 plus interest on June 30, 1982, and $ 14,200 plus interest on June 30, 1983. The long-term promissory note from Kachina '81 to BAI in the amount of $ 4,626,750 was executed by Kachina '81's general partner and in counterparts by each of the partnership's limited partners. Language in the note specified that "Anything herein to the contrary notwithstanding, the total liability of the Limited Partner hereunder shall not exceed that sum set out below adjacent to such Limited Partner's signature." Schamadan's liability was limited to $ 93,000. Frank's liability was limited to $ 186,000. The $ 4,626,750 long-term note nowhere mentioned the possibility of the noteholder's having recourse against the individual partners, personally, in the event of a payment default on the note. The Kachina '81 partnership agreement provided that "Each Additional Limited Partner shall be further personally liable to make total additional contributions *468 * * * to the Class B capital of the Partnership up to approximately Four Hundred Sixty-Five percent (465%) of the amount of such Additional Limited Partner's Class B Primary Contribution [in the minimum amount of $ 20,000]. * * *" The private offering memorandum for Kachina '81 contained a 30-page tax opinion from Wentworth & Lundin. The tax opinion used materials appearing in documents prepared for equipment leasing transactions prepared by Klineman. The Kachina '81 offering memorandum also included a letter from Price Waterhouse, similar to its letter in Apache, which set forth the financial forecasts. The forecasts reflected the judgment of Kachina '81's management. "However, some assumptions [underlying the forecasts] inevitably will not materialize and unanticipated events and circumstances may occur; therefore, the actual results achieved during the forecast period will vary from the forecast, and the variations may be material." In its letter, the accounting firm concluded that a $ 20,000 capital contribution would result in a cash return of $ 18,170 to the limited partner. This conclusion was premised on a zero value being given to the equipment at the expiration *469 of the SMI lease. Moreover, Price Waterhouse reflected in its Kachina '81 letter that in 1986 the partnership would reach a "turn around point." Finally, Gallagher believed that, under the forecasts, the limited partners of Kachina '81 would actually pay more taxes over the course of the transaction than they would save. At pages 29 and 30 of the offering memorandum, a discussion of events of default appears. This discussion notes the various consequences to the Kachina '81 partners and their partnership in the event of a default in obligations by SMI, by the end users, or by BAI. In the event of a default by SMI under the lease agreement between Kachina '81 and SMI, Kachina '81 had the following remedies: the Lease may be terminated by the Partnership. After such a termination, the Partnership, as direct lessor of the Equipment or by virtue of its rights as collateral assignee of the User Leases under a security agreement and collateral assignment granted by SMI to the Partnership, will be entitled, under the terms of the Lease, to the rents or other proceeds realized from the User Leases (subordinate to the prior rights of holders of the Senior Bank Indebtedness and the Baillie *470 Note). In addition, the Partnership's security interest covers any proceeds to which SMI is entitled from the sale or lease or other disposition of the Equipment prior to the date of the Lease. As a result of recent changes in the bankruptcy laws, however, in the event of a bankruptcy of SMI, the Partnership may not be entitled to terminate the Lease and could suffer delays in establishing or enforcing its rights. * * * In lieu of presenting expert testimony on the issues of the fair market value of the unencumbered Kachina '81 partnership equipment, the parties agreed that $ 4,972,034 represented the fair market value of the equipment on December 1, 1981. Moreover, the parties agreed that the projected residual value of the computer equipment at the end of the lease term to SMI was sufficient at the date Kachina '81 purchased the equipment to provide a reasonable profit to Kachina '81 and that Kachina '81 became the owner of the equipment on or about December 1, 1981. During 1981 and 1982, the Kachina '81 partnership transactions operated as planned and money passed among Kachina '81, SMI, and BAI. As in Apache, BAI looked to Kachina '81 for its source of funds to pay SMI; *471 and Kachina '81 looked to the initial capital contributions it received from its partners and to its receipt of rental income from SMI to pay BAI. Baillie never sold any Apache or Kachina '81 partnership interests nor did he ever meet with any of the limited partners of these two partnerships. Baillie utilized BAI only for the purchase of computer equipment from SMI and the sale of this same equipment to Apache, Kachina '81, and other similar SMI partnerships. The agreed upon profit to BAI in the Apache and Kachina '81 transactions was half a point, or one-half of one percent of the total purchase price of the equipment in each transaction. This profit was reflected in an interest rate differential existing between those interest amounts the partnerships were to pay BAI and those interest amounts BAI was to pay SMI. Baillie's profit in the Apache transaction equalled about $ 16,600; and his profit in the Kachina '81 transaction approximately equalled $ 15,000. A balance sheet filed by BAI with the Arizona Corporation Commission ("ACC") for the reporting year ended December 31, 1979, shows that BAI had no assets and no liabilities or capital. For the reporting years ended December 31, 1980 and *472 1981, BAI's balance sheets filed with the ACC reflect respective asset amounts of $ 3,412,500 and $ 5,567,500, comprised entirely of accounts receivable, and liabilities in the same respective amounts, comprised entirely of long-term obligations. For these two years, BAI's capital account is zero. For the reporting year ended December 31, 1982, BAI's filed balance sheet with the ACC reflects assets of $ 15,255,305 -- $ 1,000 in cash and $ 15,254,305 in accounts receivable; liabilities of $ 15,254,305, comprised entirely of long-term obligations; and a common stock, capital account of $ 1,000. BAI's corporate income tax return (Form 1120) for the taxable year 1981 reported taxable income of $ 18,125 resulting from a difference between interest income reported of $ 727,596 and interest expense reported of $ 709,471. The interest income and expense arose from the Apache and Kachina '81 transactions. A subchapter S election was attached to the 1981 return. The only assets and liabilities listed on the 1981 BAI corporate income tax return consisted of accounts receivable and notes payable in the identical amounts of $ 5,567,500. The accounts receivable represented receivables from *473 Apache and Kachina '81; the notes payable are tied to these same partnerships. In 1981, the corporation reported no capital whatsoever. When Apache was initially proposed, Feldheim suggested to Baillie that he consult his own lawyer and was told that Baillie was represented by Mr. Boutell of Powers, Ehrenreich, Boutell, and Kurn. On BAI's participation in the Kachina '81 transaction, Baillie had only minimal discussions with that transaction's preparers. Moreover, he did not involve Boutell in the discussions because Kachina '81 "was identical in format [to Apache] and the same legal firm had drawn it up and my cursory examination of it at the time of the signing indicated it was in good form." SMI, as general partner of Apache and Kachina '81, had an interest in both the capital and net profits of the Apache and Kachina '81 partnerships during each of the years in dispute in this case. OPINION The first issue we address is whether petitioners are entitled to deductions with respect to sales and leasebacks of computer equipment. In our addressing this issue, both respondent and petitioners would have us first examine the validity of the leases between Apache and SMI and *474 between Kachina '81 and SMI. Respondent would have us find that "During the term of the operating end- user leases, the purported leaseback[s] from the partnership[s] to SMI [are] * * * sham[s]." Petitioners, on the other hand, would have us find that "The form of petitioners' transactions must be respected; petitioners were the owners of the equipment for tax purposes. The leases between the partnerships and SMI are valid and not tax shams." Prior to addressing this first argument, we reiterate that the parties have agreed that a reasonable prospect of profit from the residual value of the equipment exists in the transactions and that the respective partnerships are the owners of the equipment. [9] These stipulated agreements were unqualified. On brief, respondent further notes that "the partnerships are viewed as being the owners of the equipment for tax purposes." Having established the factual background in which we address the issues in this case, we now turn to respondent's framing of this first argument. Respondent states, Respondent has regularly *475 challenged the shelter aspect of similarly structured equipment leasing transactions, arguing primarily that the investor lacks a valid profit motive or that the structure of the transaction fails to convey the burdens and benefits of ownership of the equipment to the investor. With several significant exceptions, respondent has not been successful with these lines of argument. [Citations omitted.] In the present cases respondent has stipulated that the respective partnerships are the owners of the equipment and that a reasonable prospect of profit from the residual value of the equipment exists. So the typical not-for-profit and burdens-and-benefits-of-ownership arguments are not advanced here. Indeed such arguments merely serve to obscure the key defects in the structure of these equipment "wrap" lease shelters. Respondent directly challenges a different portion of the tax shelter form. Respondent urges the Court to examine the purported lease between each limited partnership and SMI (the "wrap" lease) and determine whether, in fact and at law, the purported lease is in part, a sham. It is respondent's view that no right to possession is in fact transferred through the *476 partnership lease, because the right of possession has been previously conveyed to the respective end-user lessees. * * * To respondent's knowledge, this is the first time the respondent has actively challenged whether or not the purported wrap lease is in fact valid, in light of the prior transfer of possessory rights to end-user lessees. * * * We do not dispute respondent's contention herein that even though an agreement may take the form of a lease, in appropriate circumstances such a lease still may be scrutinized and, if lacking in substance, the lease may be disregarded as a sham. Miller v. Commissioner, 85 T.C. 1064, 1073 (1985); see also Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Knetsch v. United States, 364 U.S. 361 (1960). Generally, the form of a leasing transaction should be respected so long as the lessor retains significant and genuine attributes of a traditional lessor. Frank Lyon Co. v. United States, 435 U.S. at 585; Mukerji v. Commissioner, 87 T.C. 926, 958 (1986); Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). "We cannot ignore the reality *477 that the tax laws affect the shape of nearly every business." Frank Lyon Co. v. United States, 435 U.S. at 580. Therefore, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, 435 U.S. at 581; Packard v. Commissioner, 85 T.C. 397, 417 (1985); Estate of Thomas v. Commissioner, 84 T.C. at 432. If, however, we determine "that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists," we will disregard the transaction for Federal income tax purposes. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Levy v. Commissioner, 91 T.C. 838, 854 (1988); Larsen v. Commissioner, 89 T.C. 1229, 1251-1252 (1987), on appeal (9th Cir. 1988). Based on this standard, a determination that the transaction is an economic sham is inappropriate *478 if either a business purpose or a reasonable possibility of profit, apart from expected tax benefits, is found to have been present. Torres v. Commissioner, 88 T.C. 702, 718 (1987). In this case, we cannot agree with respondent's assertion that the leases between the partnerships and SMI were lacking in economic substance or business purpose. These leases provide for the payment of rent over a fixed term and for the protection of the partnerships in the event of SMI's default on its payment obligations. These provisions are characteristics of a lease, which has been defined as "a contract by which one owning such property grants to another the right to possess, use and enjoy it for specified period of time in exchange for periodic payment of a stipulated price, referred to as rent." Black's Law Dictionary 800 (5th ed. 1979). More importantly, the parties have agreed that the projected residual values of the equipment at the end of the lease terms to SMI were sufficient at the dates the partnerships purchased the equipment to provide a reasonable profit to the partnerships. Moreover, as noted by Price Waterhouse in its review of the forecasts tied to each equipment *479 leasing transaction, the partners were to receive cash distributions during the term of the leases to SMI. These cash distributions would also reflect a return and benefit to the partners. Petitioners have demonstrated the existence of a reasonable possibility of profit. Moreover, it was only through the lease agreements between SMI and the partnerships that petitioners acquired their rights to these possible profits. Accepting such, we do not find that the lease agreements between SMI and Apache and between SMI and Kachina '81 are shams. This finding is reinforced by our critical consideration of the primary ground on which respondent supports his contention that the leases are shams. Respondent points out that the computer equipment covered under the leases between SMI and the partnerships had previously been leased to end users and who were still operating under such leases. Because of these prior end user leases, respondent questions whether the partnerships acquired any possessory rights in the computer equipment that could then be leased to SMI. That respondent would raise this query is in direct contradiction to his unqualified admissions that the partnerships acquired *480 ownership rights for tax purposes and that the partnerships' benefits and burdens of ownership were unassailable. On their purchase of equipment, the partnerships had acquired, as one of their unqualified benefits of ownership, the right to decide to whom possessory rights would be granted. [10] Here, the partnerships acknowledged and acceded to SMI's leasing of possessory rights in the equipment to the end users. This acknowledgment and accession created a vertical legal relationship among the Apache and Kachina '81 partnerships, as lessors; SMI, as lessee and sublessor; and the end users, as sublessees. Respondent doubted that a true subleasing between SMI and the end users could arise at the time SMI became a lessee of the computer equipment. Respondent opines that a "true sublease" can arise in a sale/leaseback transaction only when the "sale to the investor and leaseback in fact [occur] prior to, or at the same time, as the sublease to the end-user." We refuse to accept respondent's myopic view as to what qualifies as a "true sublease." In *481 the instant case, SMI possesses the right to release the equipment on the termination of the end user leases. This subsequent re-leasing, even if to the same end users, would qualify as a "true sublease" under respondent's definition of that term. After the re-leasing, however, the structured relationship between the partnerships, SMI, and SMI's lessees remains the same as that which existed prior to the re-leasing. That the relationships remain unchanged comports with our view that, on the partnerships' equipment purchases, the created structure between the partnerships, SMI, and the end users becomes a structure between lessors, a lessee/sublessor, and sublessees. [11] Respondent's quibbling in this respect promotes the intricacies of hairsplitting and, as such, exalts form over substance. *482 We have considered respondent's other supporting points in this regard and find them to be unpersuasive. The partnerships acquired unqualified and total ownership rights in the computer equipment and subsequently leased the equipment to SMI under agreements which are not shams. Having decided that the leases between SMI and the partnerships are not shams, we next consider respondent's argument that BAI "served no valid economic or business purposes in the transactions other than for tax purposes and must be ignored." BAI's presence in the instant equipment leasing transactions was at the behest of the transactions' preparers - Russell, Stiteler, and Feldheim. Petitioners bear the burden of proving that BAI's presence should be respected. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). We have on a number of occasions considered whether an entity interjected into a transaction is placed in the transaction as a "strawman." See Bussing v. Commissioner, 88 T.C. 449 (1987), supplemental opinion 89 T.C. 1050 (1987); Tolwinsky v. Commissioner, 86 T.C. 1009 (1986); Packard v. Commissioner, supra. *483 We have disregarded such entities in those instances where no genuine suggestion of any business purpose for the entity's insertion is forthcoming. See Tolwinsky v. Commissioner, 86 T.C. at 1037. In view of all the evidence, we do not believe that BAI's participation served any valid business purpose. The very terms of the agreements covering the transactions suggests that BAI's participation was not compelled by business reasons. The BAI notes to SMI are all nonrecourse. Further, the partnerships were permitted to cure any deficiency on the underlying secured bank indebtedness and have such curing payments offset their debt to to BAI. In purchasing computer equipment worth more than $ 8,000,000 in total, BAI was required to front only $ 1,000 -- this $ 1,000 payment being BAI's outlay to SMI on November 1, 1981, on its purchase of the equipment in the Kachina '81 transaction. In all other instances where BAI was to make a payment to SMI, BAI had previously received from the partnerships the monies it was to pay. Though we note that this flow of monies is often embodied in shelter transactions similar to those before us, BAI's minuscule exposure in this instance *484 does not augur well for the existence of any business purpose underlying its insertion into the instant transactions. Further, we find that BAI's participation in the negotiations surrounding its insertion into these equipment leasing transactions was minimal to none. Though petitioners point out that BAI was represented by Mr. Boutell, they at no time produced him as a witness. Mr. Boutell's conspicuous absence from the witness stand weighs heavily against petitioners. As we said in Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968), "The burden of proof [is] upon petitioners and we cannot assume that the testimony of a critical absentee witness would have been favorable * * *. Indeed the normal inference is that it would have been unfavorable." See also Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Bresler v. Commissioner, 65 T.C. 182, 188 (1975); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). With Mr. Boutell's absence, petitioners produced little to no evidence to substantiate *485 their assertion that representatives on BAI's behalf actively sought to protect and bargain for that entity's interests in these leasing transactions. We are under the distinct impression that, with regard to the Apache transaction, Mr. Boutell served as a mere "yes man," blindly accepting the transaction as presented to him. With regard to the Kachina '81 transaction, Baillie openly admits that he gave the documents in that transaction only a cursory examination and that he did not even follow the mere formality of having Mr. Boutell examine the agreements. Petitioners would suggest that BAI was inserted into the transactions to solve potential problems in the event of SMI's bankruptcy. We find this explanation to be faulty and an after-the-fact, disingeneous explanation to justify the structure of the instant transactions. [12] In the offering memoranda proffered to the limited partners of Apache and Kachina '81, no explanation of how BAI would effectively serve the interest of the limited partners in the event of SMI's bankruptcy appears. Since it is these partners who bear the burden of the transactions' structure as presented them, such an explanation on the part of the transactions' *486 preparers would be prudent, to say the least. Moreover, it seems anomalous that the transactions' preparers would turn to a corporation without employees, with no assets other than accounts receivable directly tied to leasing transactions prepared by these same individuals, and without the independent, financial wherewithal to withstand any default on SMI's part. We note that the net worth of SMI was far more substantial than that of BAI. *487 Additionally, at trial, Stiteler testified as follows: Q. Did you have an understanding as to how the insertion or use of an independent third party, such as Baillie Associates, would solve all this problem from a bankruptcy standpoint? A. No. Q. You did not? A. I -- no. You mean, all those technical reasons on why that should be? Q. Yes, sir. A. No. I just knew that was the thing to do -- I mean, I was told. I didn't know it, but I was told that that was the thing to do. Feldheim testified, Q. You testified regarding bankruptcy aspects. What's the function of a trustee in bankruptcy? A. Well, I testified as to what I -- you know, I'm not a bankruptcy attorney. * * * Q. Did you understand then how the insertion of Baillie Associates would defeat a trustee in bankruptcy in this transaction upon the bankruptcy of SMI? A. * * * I think what I said is that in certain circumstances it's my understanding that by having an independent third party in the transaction, it might be a deterrent to a trustee in bankruptcy, and this is what I understand the situation to be, without being an expert in bankruptcy law. Feldheim also concluded that *488 there was no structure that would completely protect the limited partners in the event of SMI's bankruptcy. From this equivocal testimony, we are impressed that even the transactions' preparers were unsure of the bankruptcy explanation. Stiteler stated that he had gotten the suggestion to insert BAI from Klineman. Klineman, nevertheless, was not produced as witness in this case and, thus, could not serve as a collaborator for Stiteler's point that BAI's insertion served a business purpose. Furthermore, nothing in the way of legal analysis, prepared contemporaneously in time with the creation periods for the instant transactions was presented which would suggest that the transactions' preparers had researched the bankruptcy issue. At most the record reflects only a cryptic reference to bankruptcy in a handwritten note prepared by Feldheim. Finally, the preparers suggest that BAI was inserted because of Baillie's expertise in marketing computer equipment. We note that an employment contract between the partnerships and Baillie would have more directly brought this perceived expertise to the partnerships benefit. Also, a limited partner in Kachina '81 suggested that he equally *489 possessed the acumen to market the computer equipment. We find that BAI's insertion into the leasing transactions was merely "window dressing," solely serving tax-motivated purposes. BAI was made an intermediary party to the transactions as a facade to provide "at risk" status for investors who would not be truly at risk due to the nonrecourse status of the intermediary. We, consequently, disregard BAI's presence in the instant transaction. [13] Disregarding BAI, we find that in substance the partnerships purchased the computer equipment directly from SMI, a general partner in Apache and Kachina '81 possessing an interest in both the capital and net profit of these partnerships during the years in issue. *490 Section 465 provides that, where an individual invests in certain activities, including the leasing of section 1245 property, any loss from such an investment shall be allowed only to the extent that the taxpayer is at risk with respect to the activity at the close of the taxable year. Sec. 465(a)(1); sec. 465(c)(1)(C). Borrowed amounts are considered to be at risk where, among other requirements, the amounts have been borrowed for use in the activity, and the taxpayer is personally liable for the repayment of the borrowed amounts or has pledged property, other than property used in the activity, as security for the borrowed amounts. Sec. 465(b)(2). Borrowed amounts are not at risk, however, insofar as "such amounts are borrowed from any person who - (A) has an interest (other than an interest as a creditor) in such activity." Sec. 465(b)(3)(A). In 1979, the Treasury issued proposed regulations under section 465(b)(3) which provide that creditors will be deemed to have prohibited interests if they have either a "capital interest" in the activity, or an interest in the "net profits" of the activity. Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 *491 (June 5, 1979). [14] We have utilized these two tests as a guideline in determining whether any of the creditors in a transaction have prohibited other interests. Larsen v. Commissioner, 89 T.C. at 1270; Levy v. Commissioner, 91 T.C. at 867; Jackson v. Commissioner, 86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). *492 Petitioners do not dispute that SMI has such a prohibited interest in the instant transactions. In fact, at trial, counsel for petitioners conceded, Now, the second issue, and this will be where the factual issue will be, involves Baillie & Associates. The issue as framed is whether Baillie Associates is a "strawman" in these transactions such that the real lender in the transaction is SMI, a party having a prohibitive income and capital interest under Section 465. Again, getting back to the chart, your Honor, the evidence will show that if Baillie served no commercial reason, you could just take him away from the transaction, collapse him out, then the Government contends that this is a prohibitive income and capital interest, and they would be right - if he serves no interest at all - and they would win. Accepting this concession, we find that petitioners are not at risk on amounts deemed borrowed from SMI and that BAI was inserted merely to satisfy the formalities of the "at risk" rules. Respondent questions whether the relevant debts in these equipment leasing transactions are bona fide. Our finding that BAI served no business purposes in the transactions does *493 not of necessity lead to the conclusion that the petitioners' notes are invalid for tax purposes. Though in Bussing v. Commissioner, supra, we determined that the note therein was not genuine for tax purposes and that this determination was intertwined with our finding that the intermediate party in that case must be disregarded, we, nonetheless, look to all the facts and circumstances surrounding the note before concluding that the note was not genuine. The evidence here establishes that petitioners' notes are genuine for tax purposes. In purchasing the computer equipment, the partnerships paid cash and executed notes equal in amount and value to the equipment's fair market value. Under the terms of the partners' notes payments were to be made timely. The paying and lending parties also respected the formalities of the notes. Payments on petitioners' notes came in the form of either capital contributions or rental payments. Payments did move from SMI, as lessee, to the partnerships and eventually back to SMI, as creditor. These considerations support our conclusion that all the petitioners' notes are bona fide. [15] Finding petitioners' notes to be bona *494 fide leads us to the results that petitioners, through the partnerships in which they acquired an interest, have purchased the computer equipment at its full fair market value and that petitioners' notes are to be respected for all tax purposes. In respecting all terms of petitioners' notes as executed, we acknowledge that this is qualified solely by our earlier determination to consider SMI as the creditor to petitioners. We now turn to petitioners' liability for the additions to tax under section 6653(a). Section 6653(a)(1) provides that an addition to tax shall be imposed if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. If the section applies, then its addition to tax is calculated on the basis of the entire underpayment of tax. Commissioner v. Asphalt Products Co.482 U.S. 117, 120 (1987). Generally, the duty of filing accurate returns cannot be avoided by placing responsibility on an agent, Pritchett v. Commissioner, 63 T.C. 149, 174 (1974); however, reasonable reliance on the advice of an expert suffices *495 to avoid the addition for negligence. Industrial Valley Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). Petitioners are educated and sophisticated men. Franks is a successful business executive, knowledgable in the computer field. Schamadan described in some detail his extensive educational and managerial experience and his familiarity with computer equipment. On the stand, Gralnek demonstrated that he is a knowledgeable investor. Petitioners' reporting positions were based on their reading and understanding of the tax opinions prepared by Wentworth & Lundin and the Price Waterhouse letters, both of which appeared in the private offering memoranda. Additionally, all petitioners sought the advice of others. Gralnek and Franks looked to their accountants. Schamadan relied on his earlier involvement in Kachina '79 and sought the advice of Stiteler. Though we note that the tax opinions, Price Waterhouse letters, and verbal advice on which petitioners relied proved erroneous, we do not think that petitioners' reliance thereon was unreasonable. See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Jackson v. Commissioner, 86 T.C. at 539. *496 For this reason, we decline to impose the addition to tax under section 6653(a). The ploy to provide at risk status for the investors was fabricated by competent, experienced and reputable tax advisors to whom investors reasonably would look to for advice. Notwithstanding the caliber of the professionals involved, however, the fact remains that the ploy of BAI is devoid of economic substance. The final issue we address is the applicability of section 6621(c) to docket Nos. 14467-85 and 16974-86. Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date on which section 6621(c) was enacted. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). This section provides for an increased rate of interest for a substantial underpayment attributable to a tax motivated transaction. A substantial underpayment is defined as an underpayment which is attributable to one or more tax motivated transactions and is in excess of $ 1,000. Sec. 6621(c)(2). Section 6621(c)(3)(A) generally prescribes the types of transactions which are *497 considered "tax motivated transactions." Under section 6621(c)(3)(A)(ii), a "tax motivated transaction" includes any loss disallowed by reason of section 465(a). We have such a disallowance in this case. The increased rate of interest under section 6621(c), therefore, applies. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Pursuant to a jointly filed status report of key cases, the parties to this litigation agreed upon test cases as trial vehicles for the litigation of three limited partnerships which involve purported sales and leasebacks of used computer equipment and in which Systems Marketing, Inc. was the general partner. The test cases selected were as follows: MAT> Partnership Petitioner(s) Docket No.
Kachina '79 Frazer, David R. & Joan M. 10035-85 &
23303-86
Apache Gralnek, David E. & Barbara C. 14467-85
Kachina '81 Franks, Ray Z. & Linda K. 16974-86
Schamadan, James L. & Janet M. 37361-85
Issues involved with Kachina '79 have been settled. Issues tied to Apache and Kachina '81 remained unresolved at the time of trial. Consequently pursuant to our order dated January 20, 1987, docket Nos. 14467-85, 37361-85, and 16974-86 were consolidated for trial.↩
2. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and rule references are to the Tax Court Rules of Practice and Procedure. * 50% of the interest due on $ 17,834.↩
3. Sec. 6621(d) was redesignated as sec. 6621(c) by the Tax Reform Act of 1986, 100 Stat. 2744. See Pub. L. 99-514, sec. 1151(c)(1)(A)-(C).↩
4. Respondent has disallowed the following expenses deducted by Apache Investors on its 1980 through 1982 partnership returns: 1980
1. Legal fees to Wentworth & Lundin - $ 8,000; 2. General partners fee to Systems Marketing, Inc. - $ 30,000; 3. Accounting fees to Price Waterhouse - $ 2,000; 4. Check fee - $ 11.42. 1981
1. Accounting fees paid to Price Waterhouse - $ 2,000. 1982
1. Accounting fees paid to Price Waterhouse - $ 2,000; 2. Legal fees paid to Wentworth & Lundin - $ 79.55; 3. Miscellaneous charge - $ 9.00; 4. Check fees - $ 16.93. The parties agree that, with respect to the 1980 taxable year, all the above-noted expenses were properly deducted by the partnership except that the $ 8,000 fee paid to Wentworth & Lundin is currently deductible only to the extent of $ 4,000 while the $ 30,000 fee paid to Systems Marketing, Inc. is currently deductible only to the extent of $ 15,000. The parties agree that, with respect to the 1981 and 1982 taxable years, all the above-noted expenses were properly deducted by the partnership. Respondent has disallowed the following expenses deducted by Kachina '81 Investors on its 1981 through 1982 partnership returns: 1981
1. Printing fee to Imperial Printing - $ 4,426.80; 2. Accounting fee to Price Waterhouse - $ 3,125; 3. General partners fee to Systems Marketing, Inc. - $ 20,000. 1982
1. Legal fees to Wentworth & Lundin - $ 1,458.96; 2. Accounting fees to Price Waterhouse - $ 3,383.96; 3. General partners fee to System Marketing, Inc. - $ 19,900; 4. Other expenses - $ 611. The parties agree that, with respect to the 1981 taxable year, all the above-noted expenses were properly deducted by the partnership except the $ 4,426.80 printing fee to Imperial Printing, which may not be expensed. The parties agree that, with respect to the 1982 taxable year, all the above-noted expenses were properly deducted by the partnership. The parties agree that there are no additions to tax under the provisions of secs. 6659 and 6661. With respect to docket number 37361-85, the parties reached a settlement which completely resolves issues tied to this docket's determined 1979 and 1980 deficiencies and partially resolves issues tied to this docket's determined 1981 deficiency. In resolving these issues, the parties have agreed that, for the taxable years 1979 and 1980, the petitioners' distributive share of partnership ordinary losses incurred by Kachina Investors is $ 5,000 and $ 9,880, respectively, instead of zero as set forth in the notice of deficiency, and that, for the taxable year 1981, the petitioners' distributive share of partnership ordinary loss from their Class A partner investment in Kachina '81 Investors is $ 2,442 rather than zero as set forth in the notice of deficiency. Moreover, the parties have agreed that the entire deficiencies in income tax due from the petitioners for each of the taxable years 1979, 1980, and 1981 represent substantial underpayments attributable to tax-motivated transactions, for purposes of computing interest payable with respect to such amounts, pursuant to sec. 6621. In his filed Amendments to Answer in the instant cases respondent alleged in the alternative that petitioners enjoyed additional income as a result of the discharge of partnership indebtedness. On brief, respondent decided not to argue this alternative allegation and we consider it to have been abandoned by him. Finally, petitioners have conceded that any interest expense incurred by or for a partnership or limited partners is investment interest expense under sec. 163(d). ↩
5. In their reply, petitioners suggest that we "should subject the government to sanctions under Tax Court Rule 33(b)↩." This suggestion of sanctions is not properly raised for our consideration.
6. A discrepancy exists with respect to SMI's 1981 net income. In one set of financial statements examined by Glen R. Cole in early 1982, SMI's 1981 net income is listed as $ 483,620. In an historical listing of SMI's net income examined by Touche Ross & Co. in December of 1983, SMI's 1981 net income is listed as $ 537,352.↩
7. In the purchase and sale agreement between BAI and Apache, the existing liens to which the equipment was subject were described as "Bank Liens" and the "Predecessor Lien, " the latter being a lien in favor of the party from whom BAI purchased the equipment.↩
8. In the purchase and sale agreement between BAI and Kachina '81, the existing liens to which the equipment was subject were described as "Bank Liens" and the "Predecessor Lien," the latter being a lien in favor of the party from whom BAI purchased the equipment.↩
9. In this respect, we note that, on brief, neither party addressed or suggested any concerns under sec. 183.↩
10. Partnerships acquired the equipment subject to the then current end user leases which were satisfactory to the partnerships.↩
11. In this regard, we quote a factual finding made in Mukerji v. Commissioner, 87 T.C. 926, 928↩ (1986), "At the time Mukerji purchased his equipment, each item of equipment was subject to an existing lease between Comdisco and an end-user which became a sublease upon Mukerji's purchase of the equipment." We make the same factual and legal conclusion in this instance.
12. At trial, petitioners sought to introduce under Fed. R. Evid. 702 a report prepared by James Marlar focusing on the problems which might arise on SMI's bankruptcy. This report was prepared, after the fact, for the trial of this case, and in no way served as a source of information for petitioners in their initial purchase of their respective partnership interests. Moreover, at trial we rejected Mr. Marlar's use as an expert. We affirm our determination citing those same legal authorities which we mentioned at trial -- United States v. Zipkin, 729 F.2d 384 (6th Cir. 1984); Marx & Co. v. Diners' Club, Inc., 550 F.2d 505 (2d Cir. 1977); United States v. Daly, 756 F.2d 1076 (5th Cir. 1985); and Energy Oils, Inc. v. Montana Power Co., 626 F.2d 731↩ (9th Cir. 1980); see also S. Saltzburg & K. Redden, Federal Rules of Evidence Manual (4th ed. 1986).
13. At this point we interject the following statement from the Supreme Court appearing in its opinion in Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613-614 (1938). A given result at the end of a straight path is not made a different result because reached by following a devious path. The preliminary distribution to the stockholders was a meaningless and unnecessary incident in the transmission of the fund to the creditors, all along intended to come to their hands, so transparently artificial that further discussion would be a needless waste of time. The relation of the stockholders to the matter was that of a mere conduit. * * *↩
14. Sec. 1.465-8(b), Proposed Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979), provides, in relevant part: (b) Loans for which the borrower is personally liable for repayment. - (1) General rule. If a borrower is personally liable for the repayment of a loan for use in an activity, the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity. (2) Capital interest. For the purposes of this section a capital interest in an activity means an interest in the assets of the activity which is distributable to the owner of the capital interest upon the liquidation of the activity. The partners of a partnership and the shareholders of a corporation described in section 1371(b) are considered to have capital interests in the activities conducted by the partnership or corporation. (3) Interest in net profits. For the purposes of this section it is not necessary for a person to have any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity.↩
15. See Van Roekel v. Commissioner, T.C. Memo. 1989-74↩.