ROBERT J. MILLER AND SUSAN F. MILLER, SAMUEL EDELMAN AND SYLVIA EDELMAN, PHILLIP PALEY AND DORENE PALEY, AND HAROLD W. PALEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26986–83.    Filed December 30, 1985.

*Timothy C. Frautschi* and *John A. Sanders*, for the petitioners.

*Edward G. Langer*, for the respondent.

OPINION

Swift, *Judge*: In timely statutory notices of deficiency, respondent determined deficiencies in petitioners' Federal income tax liabilities as follows:

| Petitioners | Year | Deficiencies |
| --- | --- | --- |
| Robert J. Miller | 1976 | [1]$5,805 |
| and Susan F. Miller | 1979 | 60,877 |
| Samuel Edelman | 1979 | 9,024 |
| and Sylvia Edelman | | |
| Phillip Paley | 1979 | 5,496 |
| and Dorene Paley | | |
| Harold W. Paley | 1979 | 9,294 |

The sole issue for decision is whether petitioners, as noncorporate lessors, are entitled to investment tax credits with respect to a crane that was leased by them as partners to their closely held corporation.

All of the facts have been stipulated, and this case was submitted to the Court without trial pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The petitioners in this case resided in Wisconsin when they joined in filing the petition herein. Petitioners timely filed their joint or individual Federal income tax returns for 1979.

Petitioners Robert J. Miller (Miller), Harold W. Paley, and Phillip Paley in 1979 were the sole shareholders of Miller Compressing Co., Inc. (hereinafter referred to as Compressing).[2] Miller served as chairman of Compressing's board of directors, and Harold W. Paley, Phillip Paley, and petitioner Samuel Edelman (Edelman) served as vice presidents of Compressing. Compressing was in the business of recycling scrap metal.

---

[1]The deficiency determined for Robert J. Miller and Susan F. Miller for 1976 is attributable to the disallowance of an investment credit carryback from 1979 to 1976 in the amount of $5,805.

[2]Miller owned 93.2 percent of the stock of Compressing, Harold W. Paley owned 4 percent of the stock of Compressing, and Phillip Paley owned 2.8 percent of the stock of Compressing.

In 1979, Miller, Edelman, Harold W. Paley, and Phillip Paley (hereinafter collectively referred to as petitioners) formed the 850 Company, a Wisconsin general partnership (hereinafter referred to as the partnership).[3] None of the partners contributed capital to the partnership. The partnership and Compressing maintained their principal places of business at the same location, and the partnership had no employees in 1979.

In June of 1979, the partnership signed a full recourse loan agreement with the Marine National Exchange Bank of Milwaukee, Wisconsin (hereinafter referred to as the bank), in the amount of $451,225. The loan agreement reflected a variable interest rate of 1.5 percent above the prevailing prime interest rate. Petitioners were jointly and severally liable as individuals for the full amount of the loan. The partnership had contacted two other lenders, but the partnership accepted the bank's loan offer because it reflected a lower interest rate than the rates offered by the other lenders.

The loan proceeds were used to purchase an American Hoist & Derrick Model 850 DEH Diesel Electric Motor Crane and one 78-inch Deepfield Scrapmaster Electric Magnet (both of which hereinafter are referred to as the crane). The purchase price for the crane was $451,225. On or about June 11, 1979, the partnership agreed to lease the crane to Compressing for a term of 7 years and 5 months or 49.5 percent of the useful life of the Crane, whichever was less. The annual lease payment was $90,000.

Under the lease agreement, the partnership, as lessor, was responsible for the operating and maintenance expenses of the Crane during the first 12 months of the lease until the amount of such expenses incurred by the partnership equaled 16 percent of the total lease payments due from Compressing during the first 12 months of the lease. After the partnership had incurred expenses in that amount, the lease agreement provided that Compressing, as lessee, was responsible for all

---

[3]The partnership agreement provided that net profits and net losses of the partnership would be allocated as follows:

| | |
|---|---|
| Miller | 74% |
| Edelman | 10 |
| Harold W. Paley | 10 |
| Phillip Paley | 6 |

expenses of operating the Crane, including expenses for maintenance, repair, and insurance. Paragraph 5 of the lease provided as follows:

5. *Service and Insurance During First Twelve Months*: During the first twelve months of the Term, Lessor [Partnership] shall pay for and provide all electric power, fuel, oil and lubricants consumed by and required for the [Crane], all repairs, parts and supplies necessary therefor, and all of the insurances provided for in paragraph 8 hereof, until the total amount expended by Lessor for all of the aforementioned purposes shall equal sixteen percent (16%) of the total of the Rentals and Impositions payable by Lessee [Compressing] hereunder for such twelve-month period. Thereafter, all such expenses shall be borne exclusively by Lessee as provided in paragraphs 6 and 8 hereof.

The parties have stipulated that petitioners believed that the partnership's purchase and lease of the crane to Compressing would be a good economic investment for the partnership, that petitioners anticipated that rental income from the lease would exceed loan payments, and that the crane would "retain its value" throughout the term of the lease. Also, it has been stipulated that in 1979 a resale market existed for the particular type of crane and magnet leased by the partnership to Compressing.

At the beginning of the lease term in 1979 and at petitioners' request, the accountant for the partnership prepared a projection of income and expenses with respect to the lease using an annual interest rate of 11 percent[4] and a residual value for the crane at the end of the lease term equal to 45 percent of its cost. That projection, excluding tax benefits, demonstrated that the residual value of the crane would exceed the remaining balance of the loan and that there would be positive cash flow over the term of the lease. In fact, however, the prime interest rate during the term of the lease rose to a high of 21.5 percent. Because the lease provided a fixed rental payment that was not linked to the variable interest rate charged on the loan, the partnership's loan payments exceeded rental income from the lease, and the lease was not profitable for the partnership.

---

[4]In December of 1978, the prime interest rate charged by commercial banks was 11.75 percent and in June of 1979, it was 11.5 percent. See D. Thorndike, Encyclopedia of Banking and Financial Tables—1985 Yearbook, part II, at 2 (1985).

The lease was beneficial to Compressing in that it allowed Compressing to obtain the use of the crane without incurring additional debt. The lease also gave Compressing an option to purchase the crane at the end of the lease term at the Crane's then fair market value.

During the first 12 months of the lease, the partnership paid $19,941.09 for maintenance, repair, and insurance expenses of the crane, an amount which exceeded 15 percent of the lease payments during the first 12 months of the lease. Compressing made lease payments to the partnership when due.

The partnership investigated and considered the purchase and leasing of additional cranes, and in September of 1980, it purchased a second crane which also was leased, on similar terms, to Compressing. The partnership suspended its search for additional leasing opportunities upon the initiation by respondent of the audits of petitioners wherein respondent challenged petitioners' claims to investment credits with respect to the crane that was purchased in 1979.

Section 38 and section 46,[5] among other things, allow Federal income tax credits for investments in certain tangible personal property, referred to as "section 38 property" and defined in section 48(a). Additional credits are allowed for investments in certain recycling equipment, referred to as "energy property" and defined in section 48(1). Sec. 46(a).[6] The parties agree that the crane qualifies as section 38 property pursuant to section 48(a), and as energy property pursuant to section 48(1).

---

[5]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in dispute.

[6]Sec. 46 provides in relevant part:

SEC. 46(a). GENERAL RULE. * * *

> *  *  *  *  *  *  *

(2) AMOUNT OF CREDIT.—

(A) IN GENERAL.—The amount of the credit determined under this paragraph for the taxable year shall be an amount equal to the sum of the following percentages of the qualified investment (as determined under subsections (c) and (d)):

(i) the regular percentage,

(ii) in the case of energy property, the energy percentage, and

(iii) the ESOP percentage.

(B) REGULAR PERCENTAGE.—For purposes of this paragraph, the regular percentage is 10 percent.

(C) ENERGY PERCENTAGE.—For purposes of this paragraph, the energy percentage is—

(i) 10 percent with respect to the period beginning on October 1, 1978, and ending on December 31, 1982 * * *

At issue herein are certain limitations on the allowance of investment credits to noncorporate lessors. Investment credits are not available to a noncorporate lessor unless property subject to the lease was manufactured or produced by the noncorporate lessor as provided in section 46(e)(3)(A), or unless the lease qualifies as a short-term lease under section 46(e)(3)(B). It is upon this latter provision that petitioners rely in their contention that the lease of the crane qualifies for the investment credits at issue herein.

Section 46(e)(3)(B) sets forth two tests, both of which must be met in order for a noncorporate lessor, under that provision, to be entitled to investment credits with respect to property leased under a short-term lease. First, the term of the lease must be less than 50 percent of the useful life of the property (hereinafter referred to as the 50-percent useful life test). Second, the lessor, during the first 12 months of the lease, must incur ordinary and necessary expenses related to the leased property in an amount that exceeds 15 percent of the lease payments received during the first 12 months of the lease (hereinafter referred to as the 15-percent expense test). Section 46(e)(3)(B) provides as follows:

SEC. 46. AMOUNT OF CREDIT.
  (e) LIMITATIONS WITH RESPECT TO CERTAIN PERSONS.— * * *
    (3) Noncorporate lessors.—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—

          *        *        *        *        *        *        *

      (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.

The parties agree that the term of the lease at issue herein was less than 50 percent of the useful life of the crane. The parties further agree that the expenses incurred by the partnership, as lessor, for maintenance, repairs, and insurance of the crane during the first 12 months of the lease were

ordinary and necessary expenses and totaled an amount in excess of 15 percent of the lease payments received during the first 12 months of the lease.

Respondent, however, contends that the 15-percent expense test of section 46(e)(3)(B) requires not only that the expenses paid by the noncorporate lessor during the first 12 months of the lease be ordinary and necessary expenses of leasing the equipment and that they constitute an amount in excess of 15 percent of the lease payments during the first 12 months of the lease, but also that the noncorporate lessor independently must establish that he was engaged in the trade or business of leasing and that the particular lease in question was a part of that trade or business. Respondent relies on the reference in section 46(e)(3)(B) to "section 162 expenses" and argues that that reference to section 162 implicitly requires a finding both that the expenses were ordinary and necessary *and* that the noncorporate lessor was in the trade or business of leasing.[7]

Respondent argues further that petitioners formed the partnership and structured the lease transaction in question merely to provide the individual petitioners herein with substantial tax credits and deductions in order to reduce their Federal income tax liabilities. Respondent suggests that section 46(e)(3)(B) was enacted with the specific legislative intention to deny such tax benefits to individuals or groups who seek to utilize the tax benefits of leasing to shelter from tax a substantial part of their other income.

Petitioners respond with equal vigor. They assert (1) that Congress chose to make the availability to noncorporate lessors of investment credits with respect to short-term leases dependent upon the satisfaction of the two objective tests provided in section 46(e)(3)(B) as those two tests are applied to a particular lease; (2) that there is no trade or business test in section 46(e)(3)(B) beyond the two objective tests; and (3) in the alternative, that if there is an additional trade or business test in section 46(e)(3)(B), the partnership satisfied that test by virtue of its participation in the lease in question. Petitioners argue further that no inquiry into petitioners' subjective intent or motive in entering into the lease is necessary or

---

[7]Sec. 162(a) provides, in part, as follows:

SEC. 162(a). IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

required under the statute. Petitioners emphasize that the lease was a bona fide business transaction and that the loan was negotiated with independent creditors.

Further, petitioners contend, the lease imposed a fair rental charge for the use of the crane, and petitioners reasonably expected that the lease would be profitable to the partnership. For the reasons explained below, we agree with petitioners.

The legislative history of section 46(e)(3)(B) explains that the purpose of the two objective tests set forth therein was to establish when a particular lease transaction would be considered to constitute a business activity of the taxpayer, as well as to establish when a noncorporate lessor would be able to claim investment credits with respect thereto. The House report explains that the bill provides, in general, for the allowance of the credit in the case of short-term leases—

*since in these cases the leasing activity constitutes a business activity* of the taxpayer, rather than a mere investment, i.e., a financing arrangement. * * * [H. Rept. 92–533 (1971), 1972–1 C.B. 498, 513. Emphasis supplied.]

In other words, if a particular lease qualifies as a short-term lease under the two objective tests, it will be regarded as constituting a business activity of the taxpayer, not a mere passive investment, and it will qualify for the applicable investment credits. The above explanation in the House report strongly supports petitioners' position that the statute requires only that a particular lease meet the two objective tests of section 46(e)(3)(B).

The House report further explains that the reason two objective tests were established in section 46(e)(3)(B) is that if those tests are met "the lease is quite likely to represent a normal *business* transaction of the lessor rather than a passive investment entered into for the purpose of sheltering income." H. Rept. 92–533 *supra*. (Emphasis supplied.) That explanation also supports the conclusion that where a particular lease transaction satisfies the two objective tests of section 46(e)(3)(B), Congress intended that the lessor would be considered to be engaged in the business of leasing.

The manner in which the 15-percent expense test is to be calculated under the statute further supports petitioners' interpretation of section 46(e)(3)(B). The expenses paid by the noncorporate lessor only with respect to a particular lease are

to be compared with the noncorporate lessor's income from that lease during the first 12 months of the lease. Sec. 46(e)(3)(B); sec. 1.46–4(d)(3)(i), Income Tax Regs. That calculation clearly ignores the lessor's "other" activities (whether passive investment or trade or business) and requires a separate calculation and a separate determination for each lease. Furthermore, the calculation of the 15-percent expense test is based only on the first 12 months of the lease, which suggests that satisfaction of that test is not dependent upon the noncorporate lessor's trade or business activities beyond the particular lease in question.

In summary, the 15–percent expense test of section 46(e)(3)(B) focuses on each particular lease in question and then only on the first 12 months thereof. That approach refutes respondent's argument that Congress intended a noncorporate lessor to be subject to an additional trade or business test which would raise questions concerning the lessor's activities beyond the particular lease in question.

Respondent relies upon statements in the legislative history to the effect that Congress' general objective in enacting the limitations of section 46(e)(3)(B) was to limit the allowance of investment credits to noncorporate lessors who conducted an "active business" and who were not just passive investors. See H. Rept. 92–533, *supra*, 1972–1 C.B. at 513; S. Rept. 92–437 (1971), 1972–1 C.B. 559, 583. That general objective is undisputed. Respondent confuses the general legislative objective with the manner in which Congress chose to implement that objective. The question before us centers not on the general legislative objective, but on whether that objective was implemented by enactment in section 46(e)(3)(B) of a two-pronged objective test relating to a particular lease, or by enactment of that test plus an additional test relating to the noncorporate lessor's other trade or business activities. As indicated, we conclude that the former was Congress' intent.

For the reasons explained above we believe that the reference in section 46(e)(3)(B) to "section 162" simply describes the *type* of ordinary and necessary expenses that are to be included in making the calculation of the 15-percent expense test. The reference therein to section 162 does not require the noncor-

porate lessor to satisfy an additional trade or business test.[8] As we stated in *Ridder v. Commissioner*, 76 T.C. 867, 876 (1981), in discussing the 50-percent useful life test of section 46(e)(3)(B)—

In drafting section 46(e)(3)(B), * * * Congress decided to impose two hard-and-fast tests * * *. In effect, Congress chose a more easily administered approach (which, for taxpayers, provides predictability) and sacrificed some small measure of perfect equity. Not only was this choice at least arguably reasonable, it is not for us in any case to pass upon the wisdom of legislation. [Citations omitted.]

We conclude that there is no trade or business test in section 46(e)(3)(B) beyond the two objective tests set forth therein.

We do not dispute respondent's contention herein that even though an agreement may take the form of a lease which meets the objective tests of section 46(e)(3)(B), in appropriate circumstances, such a lease still may be scrutinized, and, if lacking in substance, the lease may be disregarded as a sham. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Knetsch v. United States*, 364 U.S. 361 (1960); *Braddock Land Co. v. Commissioner*, 75 T.C. 324, 329 (1980).

We cannot agree with respondent's assertion, however, that the lease under consideration herein was lacking in economic substance or business purpose. The partnership negotiated at arm's length with an unrelated bank a full recourse note for

---

[8] A comment is appropriate with regard to the additional argument made by respondent that since the expenses incurred by the partnership with respect to the crane would have been deductible under both secs. 162 and 212, those expenses do not meet the requirement of sec. 46(e)(3)(B) in that they were not deductible "solely" by reason of sec. 162. This argument fails to take into account the symbiotic relationship between sec. 162 and sec. 212 and the fact that most, if not all, expenses that are deductible under sec. 162 also are deductible under sec. 212. Therefore, if respondent's argument on this point were correct, no lease would qualify under sec. 46(e)(3)(B) since the ordinary and necessary expenses related to the lease would be deductible under both sec. 162 and sec. 212.

We are not required to adopt an interpretation of a statute that is contrary to its clear purpose and that leads to absurd results. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543 (1940); *Hodgson v. Board of County Commissioners, County of Hennepin*, 614 F.2d 601, 612 (8th Cir. 1980); *Lastarmco, Inc. v. Commissioner*, 79 T.C. 810, 826–827 (1982), affd. 737 F.2d 1440 (5th Cir. 1984). Sec. 1.46–4(d)(3)(ii), Income Tax Regs., enumerates the type of ordinary and necessary expenses that do not count in the computation of the 15-percent expense test, as follows:

depreciation allowable by reason of section 167 (including amortization allowable in lieu of depreciation); interest allowable by reason of section 163; taxes allowable by reason of section 164; and depletion allowable by reason of section 611 are examples of deductions which are not taken into account in applying the test. * * *

No mention is made in the regulation to expenses deductible under sec. 212 because it would be inappropriate to do so. Clearly, even though expenses may be deductible under both sec. 162 and sec. 212, they may be counted in the determination of whether the 15-percent expense test is met.

the purchase price of the crane, under which petitioners were jointly and severally liable. Petitioners had a reasonable expectation of making a profit from the lease of the crane. Based upon the projections calculated by their accountant, and excluding possible tax advantages, petitioners estimated that rental payments over the term of the lease would exceed by $81,000 the sum of petitioners' debt service on the note and the maintenance, repair, and insurance expenses incurred by the partnership with respect to the crane. The lease also was of economic benefit to Compressing because it allowed Compressing to avoid additional debt.

Respondent contends that the lease was merely a financing arrangement and that it involved no entrepreneurial risk on the part of petitioners. Whether a lease agreement is in substance a financing arrangement is dependent upon the intent of the parties as evidenced by the provisions of the agreement read in light of all the facts and circumstances existing at the time the agreement was executed. *Western Contracting Corp. v. Commissioner*, 271 F.2d 694, 701–702 (8th Cir. 1959); *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836, 844–850 (1972), affd. 500 F.2d 1222 (9th Cir. 1974). Such factors as the short-term nature of the lease agreement, the lessee's fair market value purchase option, and the full recourse liability of the general partners on the loan support our conclusion that the lease in question was not merely a financing arrangement, but that petitioners herein negotiated a bona fide lease at terms they expected would return to the partnership a reasonable profit.

Further, even if there were a separate trade or business test in section 46(e)(3)(B) beyond the two objective tests, we would find for petitioners herein. The maintenance, repair, and insurance expenses incurred by the partnership with respect to the crane are the type of ordinary and necessary expenses typically incurred in the active conduct of a trade or business. It is settled that a taxpayer may be engaged in a trade or business even where the taxpayer rents or leases only one property or piece of equipment. See *Curphey v. Commissioner*, 73 T.C. 766, 774 (1980); *Fegan v. Commissioner*, 71 T.C. 791, 814 (1979), affd. in an unreported decision (10th Cir. 1981); *Elek v. Commissioner*, 30 T.C. 731, 733 (1958); *Lagreide v. Commissioner*, 23 T.C. 508, 512 (1954); *Hazard v. Commissioner*, 7 T.C. 372,

375 (1946).[9] The partnership herein was engaged in the trade or business of leasing, and the ordinary and necessary expenses incurred in connection with the lease of the crane were deductible by reason of section 162.

In view of the foregoing, petitioners are entitled to the investment tax credits claimed with respect to the lease of the Crane.

*Decision will be entered under Rule 155.*

---

[9] See also Rev. Rul. 78–144, 1978–1 C.B. 168; Rev. Rul. 60–206, 1960–1 C.B. 201.