JAMES D. PIERCE and SUSANNE C. PIERCE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pierce v. Commissioner
Docket No. 38699-86
United States Tax Court
T.C. Memo 1989-647; 1989 Tax Ct. Memo LEXIS 648; 58 T.C.M. (CCH) 865; T.C.M. (RIA) 89647; December 7, 1989
Daniel S. Weber, for the petitioners. Thomas A. Dombrowski, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a timely notice of deficiency, respondent determined a deficiency in petitioners' 1981 joint Federal income tax liability in the amount of $ 130,208. In his answer, respondent increased the amount of the deficiency to $ 171,834. After settlement of some issues, the issues for decision are: (1) Whether petitioners are entitled to a small business stock loss under section 1244; [1] (2) whether petitioners are entitled to depreciation deductions and investment tax credits with respect to video games; (3) whether petitioners are entitled to a nonbusiness bad debt deduction in the amount of $ 76,500; and (4) whether petitioners are entitled to depreciation deductions and investment tax credits with respect to two cars. *652 FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife and resided in El Cajon, California when they filed their petition. Unless otherwise indicated, all references to petitioner are to James D. Pierce. After incurring a disability that forced his retirement from a farming business in which he had been engaged for 18 years, petitioner decided to go to law school. To earn additional income while in school, petitioner purchased two video game machines, placed the machines in hotel lobbies, and split the proceeds from the video games with owners of the hotels. After operating this video game business for a number of months on a part-time basis, petitioner concluded that the business could earn substantial income. Accordingly, in 1977, petitioner and two other individuals organized a corporation named Cinematronics, Inc. ("Cinematronics"). Each of the other individuals contributed capital in the amount of $ 10,500, and petitioner contributed capital in the amount of $ 500 to the corporation. In 1977 and 1978, Cinematronics engaged primarily in the business of leasing video games. In later years, Cinematronics's business *653 consisted primarily of manufacturing and selling video game machines. Due to the almost immediate success of Cinematronics, petitioner quit law school and acquired the Cinematronics stock owned by the other individuals. Petitioner became the controlling shareholder and began working full time at Cinematronics. In each of the years 1978 through 1981, Cinematronics earned gross receipts of approximately $ 92,000, $ 192,000, $ 30 million, and $ 10 million, respectively. Because of the financial success of Cinematronics in 1980 and 1981, plans were undertaken to have the corporation become a publicly-traded company. In 1982, however, Cinematronics began to experience financial difficulties, and by the end of 1982 Cinematronics filed for bankruptcy. In 1987, Cinematronics sold its remaining assets and ceased business activities. Section 1244 Stock Loss
In 1979, petitioner became involved in other business activities. In May of 1979, petitioner organized a California corporation by the name of Obelus, Inc. ("Obelus"), but Obelus did not sell any of its stock, nor conduct any business until April of 1981 when petitioner purchased 800 shares of the Obelus common stock *654 for a total of $ 800, and two of petitioner's coworkers at Cinematronics purchased the remaining 200 shares. Obelus then purchased a Texaco service station for an undisclosed amount. During the balance of 1981, petitioner executed and delivered a series of checks to Obelus totaling $ 80,000, but petitioner did not receive additional shares of Obelus stock in exchange for the $ 80,000. On the balance sheet that was made part of its 1981 corporate Federal income tax return, Obelus reflected the $ 80,000 received from petitioner as a loan received by the corporation. Petitioner wrote "loan" on the memo line of at least one of the checks delivered to Obelus. Petitioner personally guaranteed the lease payments Obelus owed Texaco, as well as $ 20,000 of other obligations relating to the operation of the gas station. In December of 1981, petitioner determined that his investment in Obelus was becoming too costly. Petitioner decided to sell his Obelus stock to Richard Todd ("Todd"), the manager of the gas station. Under the terms of the stock purchase agreement between petitioner and Todd, dated December 21, 1981, Todd purchased all 1,000 shares of Obelus common stock from petitioner *655 for a total of $ 100 cash. When Todd and petitioner entered into the agreement for the purchase of petitioner's stock of Obelus, petitioner only owned 800 of the 1,000 shares of Obelus common stock. On December 23, 1981, petitioner purchased the other 200 shares of Obelus common stock from the other two shareholders for a total of $ 200. Petitioner then transferred 100 percent of the Obelus common stock to Todd. As part of his obligation under the purchase agreement, however, Todd also was to renegotiate the lease with Texaco and to renegotiate other obligations of Obelus in order to release petitioner from the personal guarantees he had given with respect to the debts of Obelus. Todd succeeded in renegotiating approximately $ 26,000 of Obelus's debt obligations and eliminating petitioner's liability thereon. According to an unaudited financial statement, as of December 31, 1981, Obelus had assets of $ 29,458 and liabilities of $ 5,423, for a net worth of $ 24,035. After operating the gas station for six or seven months, Todd closed it because it was not making a profit. Todd then sold the assets of Obelus for $ 800. On their 1981 joint Federal income tax return, petitioners *656 claimed an ordinary loss deduction of $ 85,900 with respect to petitioner's sale to Todd of the Obelus stock. Video Game Leasing Activity
In early 1981, petitioner invested in Sunshine Fun Company, Inc., later renamed Starport, Inc. ("Starport"), a California corporation petitioner and his brother-in-law organized to own operate video-game arcades. Petitioner and his brother-in-law each invested $ 15,000 in Starport, and they each owned 50 percent of the stock. Petitioner's brother-in-law was president, and petitioner was vice president. Petitioner was not actively involved in the management of Starport, but he consulted with his brother-in-law at least weekly concerning the business. In March of 1981, because Starport did not have sufficient capital to purchase video games for use in its arcades, petitioner purchased 68 video games for a total cost of $ 146,924, and petitioner leased the video games to Starport pursuant to written lease agreements. The lease for each video game contained identical terms. If Starport defaulted on its lease payments, petitioner had the right to declare all payments immediately due and payable, to sue to recover all past due lease payments, *657 to take possession of the video games, to terminate the leases, and to pursue any other legal or equitable remedies. Starport failed to make any lease payments to petitioner, and petitioner did not exercise any of his rights under the default provisions of the lease agreements. Starport's video game arcade activities were not profitable, and Starport discontinued all business activities in 1982. Petitioner unsuccessfully attempted to sell the video games in 1982. On their 1981 joint Federal income tax return, petitioners claimed a depreciation deduction of $ 24,141 and investment tax credits with respect to the $ 146,924 cost of petitioner's video games. $ 76,500 Nonbusiness Bad Debt
In addition to the above investments, on January 5, 1981, petitioner loaned $ 76,500 to his cousin Shirley Peterson and to her husband Richard Peterson ("the Petersons"). Petitioner gave the Petersons $ 10,000 in cash and a cashiers' check for $ 66,500, and petitioner received a promissory note signed by the Petersons' daughters. The promissory note bore an interest rate of 10 percent. No payment was due on the promissory note before January 5, 1982. Although the promissory note was *658 signed by the Petersons' daughters, petitioner expected that the loan would be repaid by the Petersons rather than by the daughters. The promissory note was secured by a deed of trust on the residence in which the Petersons lived ("the Peterson residence"). The Peterson residence was owned by the Petersons' daughters. Petitioner already held another deed of trust on the Peterson residence which he obtained in 1980 from the Petersons' daughters as security for a prior loan of $ 87,000. The total of the loans petitioner secured by deeds of trust on the Peterson residence was $ 163,500 ($ 87,000 plus $ 76,500 equals $ 163,500). Petitioner's security interests in the property owned by the Petersons' daughters were fourth and fifth in priority among other creditors who had security interests in the same property. In March of 1981, the property securing petitioner's $ 87,000 loan and his $ 76,500 loan to the Petersons had an appraised value of from $ 440,000 to $ 460,000. The amount of other security interests in the Peterson residence totaled $ 230,000. In late 1981, the Petersons informed petitioner that they were having financial difficulties, that their daughters were being *659 threatened with foreclosure on the Peterson residence, and that they would not be able to repay the $ 76,500 loan. Petitioner did not attempt to collect payment on the promissory note to enforce his security interest in the Peterson residence, nor did he renegotiate the payment schedule on the promissory note. As a result, the first payments due on the Peterson note were not accelerated and remained due in January of 1982. In September of 1983, petitioner assigned and sold to Steve Boubon ("Boubon") the fourth deed of trust on the Peterson residence that he held, but petitioner retained the fifth deed of trust as collateral for petitioner's $ 76,500 loan to the Petersons. In February of 1984, Boubon initiated foreclosure proceedings against the Peterson residence based on the above fourth deed of trust that he acquired from petitioner, and the foreclosure action was completed in November of 1984. The foreclosure sale did not produce sufficient proceeds to satisfy the Petersons $ 76,500 debt to petitioner, and petitioner's fifth deed of trust became worthless in 1984. Business Cars
During 1980 and 1981, petitioner purchased two cars to use in connection with his various *660 business interests. On December 29, 1980, petitioner purchased for $ 37,767.92 a new 1980 Mercedes Benz 450SL, which was delivered to petitioner on January 6, 1981. During 1981, the Mercedes was driven a total of 9,614 miles. On June 11, 1981, petitioner, for $ 107,765.96, purchased and accepted delivery of a new 1980 Silver Wraith Rolls Royce. From June through December of 1981, petitioner generally used the Rolls Royce for business purposes rather than the Mercedes. In 1981, the Rolls Royce was driven by petitioner a total of 11,930 miles. During 1981, petitioner used both the Mercedes and the Rolls Royce for commuting the 5.6 miles between his home and the offices of Cinematronics. Both cars occasionally were used by petitioner for personal reasons. Petitioner's wife and children did not use petitioner's Mercedes or the Rolls Royce during 1981. Petitioner's wife had her own Mercedes, and petitioner's children had their own cars. During 1981, no meaningful records were maintained of petitioner's business use of the Mercedes or the Rolls Royce. Sometime in 1982, petitioner or his secretary made notations in petitioner's 1981 calendar book regarding petitioner's business *661 use in 1981 of the Mercedes and the Rolls Royce. The notations in the 1981 calendar book, however, do not reflect all of petitioner's 1981 business meetings, nor the place or business purpose of most of the meetings. In addition, the notations generally do not reflect which car was used to drive to the various business meetings. Total mileage on both cars in 1981 was 21,544. On their 1981 joint Federal income tax return, petitioners claimed depreciation and investment tax credits relating to the Mercedes and Rolls Royce based on 100-percent business use of the cars. Petitioners claimed no business deductions or tax credits relating to the Mercedes owned by petitioner's wife. OPINION Section 1244 Stock Loss
Petitioners' claim of an ordinary loss deduction with respect to the Obelus common stock is based on their claim that the stock qualified as section 1244 stock and that petitioner's basis therein was $ 85,900 at the end of 1981 when the stock was sold to Richard Todd. Alternatively, petitioners argue that they are entitled to a capital loss deduction with respect to petitioner's investment in Obelus. Respondent argues that petitioners are not entitled to an *662 ordinary loss deduction in the amount of $ 85,900 because a portion of the claimed investment in Obelus was not substantiated and because no more than $ 800 of petitioner's investment in Obelus qualifies as section 1244 stock. With regard to petitioners' alternative claim for a capital loss deduction for the portion of petitioner's investment in Obelus that is found to be substantiated, respondent argues that the sale of petitioner's interest in Obelus to Todd was a sham and that petitioner realized no loss in 1981 with respect to his investment in Obelus. Generally, a loss sustained with respect to qualified section 1244 stock of a small business is treated as an ordinary loss. Sec. 1244(a). Under section 1244, the amount of the ordinary loss is limited to $ 50,000 for a single taxpayer or $ 100,000 for a husband and wife filing a joint Federal income tax return. Sec. 1244(b). To qualify under section 1244 for ordinary loss treatment, the stock at issue and the corporation issuing such stock must, in general, satisfy the following requirements: (1) The domestic corporation must be considered a small business corporation (i.e., the total amount received by the corporation as *663 contributions to its capital or paid-in surplus may not exceed $ 1 million); (2) a majority of its total gross receipts must be received from sources other than passive income sources; (3) the stock must be common stock issued directly to an individual or partnership, which individual or partnership must hold the stock continuously from the date of issuance to the date of sale; (4) the common stock must be issued in exchange for money or other property but not for other stock or securities. Sec. 1244(a), (c)(1), (2), and (3); sec. 1.1244(a)-1(b), Income Tax Regs.; Adams v. Commissioner, 74 T.C. 4, 8 (1980). Respondent concedes that the initial 800 shares of Obelus common stock petitioner received for $ 800 qualify as section 1244 stock. With regard to the additional amounts invested by petitioner in Obelus, respondent concedes that petitioners have substantiated $ 80,200. Respondent does not seriously dispute that the additional $ 80,200 investment in Obelus by petitioner should be regarded as additional capital or equity, even though some evidence indicates that petitioner at the time regarded some portion thereof as loans or advances to Obelus. No promissory *664 notes or other written documents were executed evidencing loans from petitioner. No evidence indicates that an interest rate, maturity date or other debt terms were agreed to. Other than the $ 80,000 from petitioner, the only capital Obelus received was the $ 1,000 received in exchange on its issuance of the 1,000 shares of common stock. Obelus was able to obtain other loans from outside lending institutions but only after petitioner personally guaranteed payment of the loans. Based on the facts before us, we conclude that the $ 80,000 in checks paid to Obelus by petitioner was to be at the risk of the business, rather than a definite debt obligation repayable to petitioner in any event. The $ 80,000 represented additional capital or equity petitioner invested in Obelus, rather than loans or advances to Obelus. See A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970). Because no additional shares of Obelus stock were issued to petitioner with respect to this additional $ 80,000, the amount thereof is added to petitioner's basis in the 800 shares of section 1244 stock that were issued to petitioner in April of 1981. *665 Section 1244, however, expressly provides that increases in the basis of section 1244 stock, after its original issuance, including contributions to capital of the corporation, do not qualify for ordinary loss treatment under section 1244. Sec. 1244(d)(1)(B); Morgan v. Commissioner, 46 T.C. 878, 893 (1966). In addition, the increase in basis is not treated as a new issuance of section 1244 stock. Sec. 1.1244(c)-1(b), Income Tax Regs.
Under section 1.1244(d)-2(a), Income Tax Regs., where a loss is sustained on section 1244 stock and where the taxpayer's basis in the stock has increased during the time the stock was held, the loss must be apportioned between the stock qualifying as section 1244 stock and the capital interest not qualifying as section 1244 stock. The loss apportioned to the qualifying section 1244 stock is the only portion of the loss that is treated as an ordinary loss and the remaining portion of the loss is treated as a capital loss. Secs. 1.1244(d)-2(a) and (b), Income Tax Regs. The total loss is apportioned between the qualifying section 1244 stock and the non-section 1244 stock interest in the same ratio that the taxpayer's basis in the section *666 1244 stock bears to the taxpayer's total basis in the stock of the corporation. Sec. 1.1244(d)-2(a), Income Tax Regs.
The 200 shares of common stock petitioner purchased from his co-workers in December of 1981 do not qualify as section 1244 stock because those shares were not issued by Obelus directly to petitioner. With regard to petitioner's alternative claim for a capital loss with respect to his non-section 1244 investment in Obelus, many details of the sale by petitioner to Richard Todd are not particularly clear. According to the terms of the written stock purchase agreement, the purchase price Todd paid petitioner for the stock included $ 100 cash and an agreement by Todd to renegotiate the corporation's debt obligations to relieve petitioner of his personal guarantees on those obligations. Todd apparently renegotiated the Texaco lease and obtained new financing for the other obligations so that petitioner was released from personal guarantees on approximately $ 26,000 of Obelus's obligations. The net assets of Obelus as reflected in the December 1981 unaudited financial report were approximately $ 24,000. Based on this evidence, petitioner received approximately fair *667 market value for his Obelus stock. [2]
On the limited facts before us on this issue, we conclude that the economic substance of the transaction between petitioner and Richard Todd is that petitioner received $ 100 in cash and was released from $ 26,000 of personal guarantees in exchange for his Obelus stock in which petitioner had a basis of $ 81,000. [3] Thus, petitioner sustained a capital loss in 1981 on the sale of his Obelus stock to the extent the loss does not qualify for ordinary loss treatment under section 1244. We conclude that petitioner incurred a $ 55,000 loss ($ 81,000 minus $ 26,000 equals $ 55,000) on the sale of his Obelus stock of which $ 543 ($ 800 divided by $ 81,000 multiplied by $ 55,000 equals $ 543) is allocated *668 to the 800 shares of qualifying section 1244 stock and treated as an ordinary loss, and $ 54,457 ($ 55,000 minus $ 543 equals $ 54,457) is treated as a capital loss. Because petitioner held his Obelus stock for less than one year, this capital loss is a short-term capital loss. Sec. 1222(2). Video Game Leasing Activity
Respondent contends that petitioner's leasing of video games to Starport did not constitute a trade or business nor an activity entered into by petitioner with an "actual and honest objective of making a profit." Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); West v. Commissioner, 88 T.C. 152, 159 (1987); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Respondent, therefore, in his answer disallowed depreciation and investment tax credits associated with this activity and increased the tax deficiency set forth in his notice of deficiency. Respondent has the burden of proof on this issue. Rule 142(a). To support a finding of profit objective, a reasonable expectation of profit is not required, but the taxpayer's objective of making a *669 profit must be bona fide. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5-7, 9 (3d Cir. 1984). Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all relevant facts and circumstances. Hulter v. Commissioner, supra at 393; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). As explained, petitioner invested approximately $ 21,500 in a video game corporation (namely, Cinematronics) that within three or four years earned annual gross receipts of $ 30 million. Cinematronics concentrated on manufacturing video games and selling the games to customers for use in their video game *670 businesses. Petitioner's decisions to expand into the leasing of video games through Starport, and personally to purchase and then lease the video games to Starport were reasonable and were based on petitioner's belief that he and Starport could earn substantial additional income. Petitioner believed that if he continued to lease the video games to Starport after a period of time he would realize a profit. In hindsight, petitioner's decision to lease video games only to Starport may have been unwise. We do not, however, believe that this negated petitioner's profit objective. We conclude that petitioner conducted his video game leasing activities in a businesslike manner with an actual and honest profit objective. The depreciation deductions claimed with respect to petitioner's video game leasing activities are allowed, and, but for our resolution of the next issue, the investment tax credits petitioner claims with respect to his video game leasing activities also would be allowed. Investment Tax Credits - Video Games
Under section 46(e)(3)(B), individuals such as petitioner and other noncorporate lessors are entitled to investment tax credits under section 38 with *671 respect to a particular qualifying activity only if they establish, among other things, that the lease term for the property is less than 50 percent of the useful life of the property and that during the first 12 months after the property is on lease deductions allowable to the individual lessors solely under section 162 with respect to the lease of the property exceed 15 percent of the rental income from the property. Sec. 46(e)(3)(B); Seligman v. Commissioner, 796 F.2d 116, 117-118 (5th Cir. 1986), affg. 84 T.C. 191 (1985); Miller v. Commissioner, 85 T.C. 1064, 1069-1073 (1985); Sec. 1.464(d)(3)(ii) and (iii), Income Tax Regs.
Before trial, petitioner conceded that all rent, travel, entertainment, freight, and utility expenses claimed with respect to his individual video-game leasing activities on his and his wife's 1981 joint Federal income tax return were not deductible because they were either capital expenditures, or expenses for which Starport, not petitioner, was liable under the terms of the net lease agreements. Cf. *672 Betson v. Commissioner, 802 F.2d 365, 368 (9th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court; Freesen v. Commissioner, 798 F.2d 195, 198-202 (7th Cir. 1986), revg. 84 T.C. 920 (1985). Petitioner argues that he leased one video game to a video arcade operator not affiliated with Starport and that he had some expenses associated therewith. Petitioner also argues that because Starport did not make any of the lease payments his income associated with his leasing activities is zero and therefore that he satisfies the 15-percent-expense test of section 46(e)(3)(B) (i.e., 15 percent of zero income is satisfied by even the nominal expenses petitioner obviously would have incurred in connection with this activity). Treasury regulations under section 46(e)(3), however, make it clear that, for purposes of the 15-percent-expense test, the income base against which the expenses are compared is not limited to income actually received by the lessor but includes all income "payable" to the lessor. Sec. 1.46-4(d)(3)(iii), Income Tax Regs. Thus, any calculation we would make in this case would include total lease payments *673 due from Starport under the video game rental agreements even though Starport did not make the payments to petitioner. [4]
On the facts of this case, it is clear that the 15-percent-expense test of section 46(e)(3)(B) is not satisfied. Petitioner's $ 146,929 cost basis in the video games he purchased in connection with his video game leasing activities is not eligible for investment tax credits. $ 76,500 Nonbusiness bad debt
Individual taxpayers holding nonbusiness bad debts that become worthless within a taxable year are not allowed ordinary loss deductions with respect thereto under section 166(a), but they may treat the losses as short-term capital losses. Secs. 166(d)(1)(A) and (B); Benak v. Commissioner, 77 T.C. 1213, 1216 (1981). Petitioner contends that the $ 76,500 loaned to the Petersons became worthless in 1981 and *674 that he is entitled to a short-term capital loss deduction in 1981 with respect to his loss. Respondent argues that petitioner is not entitled to the deduction because the transaction between petitioner and the Petersons did not reflect a bona fide debt. In the alternative, respondent argues that the debt was not totally worthless in 1981. We agree with respondent on his second argument. Based on the appraised value of the Peterson residence in 1981, the deed of trust held by petitioner as security for the $ 76,500 note had value in 1981 that could have been the basis for a foreclosure action in 1982 in order to obtain payment of the note. Because the $ 76,500 debt obligation was not totally worthless in 1981, no deduction is allowed therefor in that year. Business Cars
Under sections 162, 212, and section 1.48-1(b)(2), Income Tax Regs., taxpayers may deduct ordinary and necessary car expenses and related depreciation and they may claim investment tax credits with respect to carrying on a trade or business or an income-producing activity. Taxpayers may also deduct expenses for overnight travel, including car expenses, if they establish that the expenses are directly *675 related to the active conduct of a trade or business or an income-producing activity. Sec. 274(a)(1)(A). Taxpayers, however, may not deduct expenses relating to overnight business travel unless they substantiate the expenses with a diary or other records that are prepared contemporaneously with the activity and that reflect the business purpose of the expenses. Sec. 274(d). Secs. 1.274-5(c)(1) and (2), Income Tax Regs. Personal living expenses are not deductible. Sec. 262. Under Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), courts are authorized (where the evidence shows that deductible business expenses were incurred) to estimate allowable business expenses other than business expenses governed by section 274. Petitioner argues that he used the Mercedes and the Rolls Royce 100 percent for business reasons in 1981 and that he has substantiated the business use of the two cars by means of his testimony and the calendar notebook entries made in 1982. Respondent concedes that petitioner used the Mercedes and the Rolls Royce for business purposes in 1981 and that the use of the two cars was an ordinary and necessary business expense. Respondent, *676 however, argues that the cars were not used for business purposes 100 percent of the time in 1981, and that petitioner has failed to satisfy the substantiation requirements of section 274 for expenses claimed for 3,143 miles of away-from-home business travel. Based on petitioner's calculation of the use of the cars for business and personal transportation, and his calculation of the overnight business travel for which the cars were used in 1981 and for which petitioner has not submitted adequate substantiation under section 274, respondent would treat, in 1981, 78 percent of the use of the Mercedes and 20 percent of the use of the Rolls Royce as business related. Respondent would calculate the depreciation and investment tax credits allowable to petitioners for 1981 based on these percentages. The calendar entries made during 1982 are not adequate to satisfy the substantiation requirements of section 274 for away-from-home business travel. Sec. 274(d); secs. 1.274-5(b)(1) and (c)(1) and (2), Income Tax Regs. We sustain respondent's disallowance of car expenses attributable to mileage totaling 3,143 with respect to petitioner's away-from-home business travel. As we have found, *677 petitioner's untimely calendar entries generally do not reflect the business purpose for the trips, nor which car was used for each trip. In addition, the mileage for the business trips generally was not recorded on the calendar at the time of the trips. As to the local transportation, petitioner used the Mercedes and the Rolls Royce to commute at least 3,000 miles in 1981 to and from the offices of Cinematronics. While petitioner typically engaged in business at lunch time, the record also shows that he used his cars for personal reasons during lunch time and outside of work hours in 1981 for at least 2,600 miles in addition to the 3,000 miles used for commuting and the 3,143 miles for away-from-home business travel. We conclude that petitioner's calendar notes, his testimony, and respondent's concession concerning petitioner's business use of the cars provide the Court with a sufficient basis for estimating petitioner's business-related use of the cars. We conclude that of the 21,544 total miles, 12,544 miles represent substantiated business related travel and that the 9,000 balance of the miles represent personal transportation or unsubstantiated overnight business travel.
*678 We conclude that of the 9,614 total miles petitioner drove the Mercedes in 1981, 7,338 miles or 76 percent of the total miles represent business miles and of the 11,930 total miles petitioner drove the Rolls Royce in 1981, 5,206 miles or 44 percent of the total miles represent business miles. The depreciation deductions and investment tax credits relating to the business use of the Mercedes and the Rolls Royce are to be computed based on these percentages of business-related use. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner received a discharge with respect to $ 26,000 of personal debt guarantees plus $ 100 cash in exchange for his stock, which apparently had a book value of $ 24,000.↩
3. Petitioner's total basis of $ 81,000 in his Obelus stock consists of the $ 800 he paid for his 800 original shares, the $ 80,000 in additional capital contributions that were substantiated, and the $ 200 petitioner paid on the purchase of the additional 200 shares.↩
4. It is noted that depreciation expenses (which have been allowed in this opinion) and certain interest expenses associated with petitioner's leasing activities (which respondent did not disallow) would not be included in a calculation of the 15-percent-expense test because they are not deductible solely under section 162↩.